## STANDARD OIL CO. (NEW JERSEY) v. UNITED STATES.

No. M–159.

Court of Claims.

April 8, 1935.

Before BOOTH, Chief Justice, and GREEN, LITTLETON, WILLIAMS, and WHALEY, Judges.

GREEN, Judge.

Plaintiff brings this suit to recover $867,-834.22 which it alleges to be due for interest on overpayments made on its income and profits taxes for the years 1916 and 1917. The overpayments are admitted, and the parties agree that they were credited on deficiencies in the payment of other taxes due from the plaintiff. The controversy is mainly as to when the overpayments for 1917 were allowed, as that date is used in determining the amount of interest which should be paid plaintiff. More specifically, the issue is whether they were allowed when the act of 1924 was in force, as plaintiff contends, or not until after February 26, 1926, when the interest computations would be controlled by the provisions of the Revenue Act of 1926. The material facts will be presented in connection with our conclusions as to the law applicable thereto.

February 1, 1925, the Commissioner advised plaintiff by means of a 60-day deficiency notice of his determination of deficiencies and overassessments as follows:

| Year | Deficiency | Overassessment |
|---|---|---|
| 1909 | $8,436.19 | |
| 1910 | 2,317.68 | |
| 1912 | 2,507.60 | |
| 1913 | 2,787.86 | |
| 1914 | 14,978.06 | |
| 1916 | | $18,653.49 |
| 1917 | | 2,366,501.02 |
| 1918 | 3,704,141.79 | |

The record fails to show any objection made to this determination, and on May 15, 1925, the Commissioner duly assessed the deficiencies and sent the collector an assessment list on which the additional assessments appeared. The assessment list also contained a notation to the effect that demand should not be made for the deficiencies until after comparison with the schedule of overassessments which was being prepared and on which the overassessments in favor of the plaintiff would appear.

The collector acted in accordance with these instructions and awaited the receipt of the schedule of overassessments which

John W. Davis and Marion N. Fisher, both of New York City (Marvin Lyons and Davis, Polk, Wardwell, Gardiner & Reed, all of New York City, on the briefs), for plaintiff.

John A. Rees, of Washington, D. C., and Frank J. Wideman, Asst. Atty. Gen., for the United States.

was signed by the Commissioner May 20, 1925. This schedule listed two overassessments in favor of plaintiff: One for the year 1916 in the sum of $18,653.49; the other for the year 1917 in the sum of $2,366,-501.02. Upon receipt of this schedule and examination of the plaintiff's tax accounts, the collector concluded that the overassessments for 1916 and 1917 were overpayments. He also found that there was outstanding $112,380.20 of the original assessment against plaintiff for 1920 on account of which plaintiff had filed a claim in abatement. The collector thereupon on his books applied the overpayment of $18,653.49 for 1916 and $93,726.71 of the overpayment for 1917 as credits upon the outstanding original assessment for 1920, and applied the balance of the overpayment for 1917 as credits against the deficiencies for other years in such a manner as to offset the entire deficiencies for the years 1909 to 1914, as shown in the table set out above, and also applied $2,241,746.92 on the deficiency for 1918, which was, as shown above, $3,704,141.79. That left an outstanding balance of the deficiency assessment for 1918 of $1,462,394.87. After having done this, the collector prepared a schedule of refunds and credits accordingly, and made entries or notations thereon and on the certificates of overassessment showing his application of the overpayments in the manner stated above. The collector then signed the schedule of refunds and credits, the schedule of overassessments, made his notations on the certificates of overassessment June 16, 1925, and returned these documents to the Commissioner, all of which was the usual course of procedure.

The object in returning the schedule of refunds and credits as made up by the collector is to obtain the approval of the Commissioner, and ordinarily the Commissioner approves it; his approval being evidenced by his signature thereto. When this has been done, it has been held in a number of cases that it constitutes the final action of the Commissioner in allowing the credit.

At this stage in the proceeding we encounter an important fact, which is that the Commissioner did not sign the schedule of refunds and credits in the form it was submitted to him by the collector. The schedule which the Commissioner signed did not contain a statement of the disposition of the 1917 overpayment. This brings us to the ultimate question in the case, namely, When

did the Commissioner allow the credits in controversy? In considering this question, it should be kept in mind that these are the credits made from the overpayment on the taxes of 1917.

The findings show that on July 2, 1925, the Commissioner signed the sheet or form on which the collector had presented the schedule of refunds and credits, but that several days before the Commissioner signed it there had been deleted therefrom all notations with reference to the disposition of the 1917 overpayment as credits in the manner proposed by the collector. In fact, there was left no reference to the taxes of 1917. We must assume that this deletion, if not done by the direction of the Commissioner, was approved by him by reason of his having signed the schedule in this form after it had been made. The schedule as signed included items of overpayment in favor of various taxpayers other than the plaintiff, and included the overpayment of $18,653.49 in favor of plaintiff for 1916, which was placed as a credit against the original assessment for 1920. It also showed the amount of interest due thereon on account of such credit application; namely, $4,385.91, which was computed from the dates the 1916 tax was paid (May 7, 1917, and March 25, 1921) to the due date of the unpaid installment of the original assessment for 1920 (December 15, 1921). No action was taken with reference to the allowance of the 1917 overpayment or credits to be made therefrom.

On or about July 20, 1925, the plaintiff, being informed that it was proposed to apply the 1916 overpayment and a part of the 1917 overpayment as credits against a portion of the outstanding original assessment for 1920, protested to the Commissioner against such action on the ground that its return for 1920 was still in process of audit and that no final determination of its taxes for 1920 had been made. Plaintiff therefore requested that the overpayment for 1916 and the portion of the overpayment for 1917 which the collector had proposed as credits against the unpaid portion of its 1920 tax be credited against the additional taxes for 1918.

July 20, 1925, the Commissioner sent the following telegram to the collector:

"Withhold further demand one hundred twelve thousand three hundred eighty dollars twenty cents on account claim abatement nineteen twenty if Government's interest not jeopardized Standard Oil Com-

pany New Jersey Stop Company will pay one million three hundred fifty thousand dollars for years nineteen seventeen and eighteen."

It is upon this telegram and the subsequent acts of the collector that the plaintiff largely relies.

Shortly after the above telegram had been received, and on July 27, 1925, the collector canceled the credits whereby he had applied the overpayment of $18,653.49 for 1916 and $93,726.71 of the overpayment for 1917 as credits against the unpaid tax of 1920 and entered these amounts as credits against the deficiency for 1918. After these entries had been made upon the books of the collector, plaintiff's account for 1918 showed a balance due of $1,350,014.67. On the same day, July 27, 1925, plaintiff paid to the collector this balance of $1,350,014.-67, which amount was credited by the collector to the additional assessment against plaintiff for 1918. After these changes and additions had been made on the books of the collector, the account was completely balanced, and nothing left due from or to plaintiff according to his books for 1918.

It is argued on behalf of plaintiff that the telegram which has been set out above not only directed the changes made upon the books of the collector, but was equivalent to the signing of a schedule of refunds and credits. It is said that the Commissioner must have known the condition of the collector's books, and the extraordinary contention is made that the telegram constituted a complete and final approval of plaintiff's tax account as shown by the collector's books after he had made the changes above recited. But it is manifest from a reading of the telegram that it approved nothing and gave no directions except to withhold action upon a certain part of the account. It may be that the Commissioner had reason to believe that, if certain entries were made upon the books of the collector and a certain payment made, the account would be balanced, but, if we were to hold that the knowledge of the Commissioner of the state of a taxpayer's account on the collector's books was sufficient to constitute an approval thereof, it would make the collector, and not the Commissioner, the official who finally determined the matter. In justice to counsel for plaintiff, it should be said that their argument is based in part on a finding of the commissioner of this court which is merely a conclusion and is not in accord-

ance with the findings on which we base our decision. There is also some contention that, when the schedule of overassessments reached the collector with a 368–M form attached, the collector was then fully advised of the Commissioner's determination with respect to all years covered by the audit and could proceed to adjust his accounts. But this court has never recognized such a principle.

It may be conceded that the approval and allowance of a credit can be shown otherwise than by a "schedule of refunds and credits," but the collector cannot make the final allowance. It must be made by the Commissioner, and there must be some affirmative evidence of action on his part that constitutes an allowance of the credit. We do not find it necessary to determine whether this action could be evidenced by an oral statement, for the only claim that can be made in the case before us is that the Commissioner's action is evidenced by a writing which he executed. Counsel for plaintiff say in their brief: "There is no magic in the schedule of refunds and credits." This is true to a certain extent. The title "schedule of refunds and credits" on a document is only a name and in some instances merely a label. The important and controlling part of the document is what is contained in the body of it to which the Commissioner has affixed his signature. The reason why the signed schedule of refunds and credits is accepted as proof of the allowance is quite apparent. It contains an itemized statement of the overpayments, refunds, and credits as well as the amount of interest, if any, due thereon, all duly certified by the Commissioner, and is his final act with reference thereto. The usual proceeding under the 1924 act was for the Commissioner to make up a schedule of overassessments with instructions to the collector to examine plaintiff's accounts and determine whether a given overassessment should be abated, or, in the event it should be found to be an overpayment, whether it should be credited or refunded, and such instructions were given in the case at bar. Upon the receipt of this schedule the collector usually made such changes or additions upon his books, and a schedule of refunds and credits was made up in accordance with the Commissioner's instructions and returned to him for consideration. The amount of interest due upon a refund or credit was computed by the Commissioner after the schedule was received by him

from the collector and before the Commissioner signed it. After the interest, if any, was included, the schedule was made up in the form above stated, and, if the Commissioner deemed it correct, he signed it. If not, he withheld approval, as he did in the case before us in respect to the credits from the 1917 overpayment. The action of the collector settled nothing. "The Commissioner of Internal Revenue is the final judge in the administrative branch of the government to decide * * * that a refund or credit should be granted." Girard Trust Co. v. United States, 270 U. S. 163, 170, 46 S. Ct. 229, 232, 70 L. Ed. 524. And, until the Commissioner had pronounced judgment on the entries as made in the collector's books, the final act was not concluded.

The claim made on behalf of plaintiff that the Commissioner knew the condition of the collector's books will be conceded in part, for the Commissioner knew how the account stood thereon when the collector returned to him the schedule of refunds and credits, but it was upon this knowledge that he declined to approve the credits in controversy. There is no evidence that the Commissioner knew of the changes made by the collector in the entries upon his books shortly after the telegram was received. In any event, the mere fact that the Commissioner has knowledge of what the collector's books show is no indication that he will approve the entries thereon, much less can it be held to show that by reason of this knowledge he has finally approved them. If this were the rule, there would be no need for the collector to send the revised schedule to the Commissioner. The main purpose in having the collector make up the account on his books in completed form is in order that the Commissioner may scrutinize it when sent to him and determine whether he will approve or reject it. But, even if the Commissioner had actually known that such entries were made, such knowledge, no matter how acquired, is far from expressing or showing an approval thereof. The proposed construction of the message would take a plain and unambiguous telegram and read out of it the instructions to leave the 1920 account open and read into it instructions to make the changes which the collector made on his own responsibility and also an approval of the account as then stated, thereby changing what was merely information with reference to a payment which plaintiff would make into a decision and determination that

it resulted in a settlement of the whole account as it subsequently stood on the collector's books. All this seems to be based merely upon an inference as to what was in the Commissioner's mind when he sent the telegram. In effect it is argued that the message constituted a comprehensive approval, not merely of the collector's books as they stood when the telegram was sent, but also as the entries would be after he had made some changes not referred to in the telegram. We are clear that such a construction is unauthorized, and that under all of the authorities—not alone those that refer to matters of taxation, but also those that pass on the question of whether an administrative official has acted—we hold that there must be some definite act of allowance or approval on the part of the Commissioner, otherwise he cannot be said to have allowed the credit. That there was no such act until a much later date is made even more definite and certain by a consideration of what the Commissioner actually did instead of drawing inferences as to what was in his mind or from what he knew. The Commissioner withheld approval when he had the credits out of the overpayment for 1917 deleted from the schedule of refunds and credits which was sent to him. He withheld approval of the credit for the 1917 taxes when he sent the telegram, and he withheld it, as we shall see, in all of his subsequent acts until he made his final certificate with reference to the disposition of the 1917 overpayment.

The cases cited on behalf of plaintiff do not, in our opinion, in any way uphold the contention made on its behalf. In United States v. Swift & Company, 282 U. S. 468, 51 S. Ct. 202, 204, 75 L. Ed. 464, the question was whether the signing of the schedule of overassessments was the final act of the Commissioner or the later act of signing the schedule of refunds and credits. It is true that the court referred therein to the fact that, when the Commissioner signed the schedule of overassessments, he had no knowledge as to what the collector's account with the taxpayer would show. But the court could not have meant that, when the Commissioner did acquire such knowledge (as he would when the schedule was returned to him by the collector), the schedule was approved without his doing anything more. If that were the rule, it would not be necessary for the Commissioner to sign the schedule when returned. Nor is there anything in the opinion from which the inference may be drawn.

that, if the Commissioner makes some orders with reference to matters which are not in controversy (as the evidence shows he subsequently did in the case at bar), he thereby approves the whole account as it stands upon the collector's books. On the contrary, all of the decisions, including the Swift & Company Case, supra, either assume or hold that his approval of the credit must be his final act with reference thereto. This rule is not only logical, for a determination that is subsequently changed cannot be said to be final, but it is also necessary, as otherwise the courts would be without chart or compass to determine when finality was reached.

The case of Royal Bank of Canada v. United States, 44 F.(2d) 249, 70 Ct. Cl. 663, is also cited in support of plaintiff's contention, but we do not think it has any application. The decision in that case turned upon the construction of a letter which the Commissioner had written to the taxpayer, and the opinion held that the letter showed that plaintiff's claim for refund had been determined and allowed, although there was some language in the letter inconsistent therewith. When this construction was placed on the letter, it settled the case, for it became a ruling and determination signed by the Commissioner.

Our construction of the telegram is sustained by the proceedings which occurred after it had been sent and the collector had changed the entries on his books as above recited. A consideration of the acts of the Commissioner will definitely show that no final action was taken by him with reference to the matters in controversy until after the 1926 act had gone into effect.

It has already been noted that, prior to the time when the telegram was sent, and on or about July 20, 1925, the plaintiff learned of the action proposed by the collector of applying the 1916 overpayment and a part of the 1917 overpayment in satisfaction of a portion of an installment of the original assessment for 1920 for which plaintiff had filed an abatement claim. The first part of the telegram seems to indicate that it was sent by reason of the protest made against such action in order that the collector would not issue a notice and demand for payment in accordance with his books, but should withhold action, and that is all. The collector, however, not only withheld action, but on his own motion went entirely beyond any directions contained in the telegram. As before stated,

he canceled the entries whereby he applied the overpayment of $18,653.49 for 1916 and $93,726.71 of the overpayment for 1917 on the unpaid tax for 1920 and entered these items as credits against the additional assessment for 1918. His books then showed that there was a balance due on plaintiff's tax account for 1918 of $1,350,014.67 which the plaintiff paid on July 27, 1925. But the Commissioner took no action in the way of approving this balance, and the evidence with reference to his subsequent acts shows that he considered the account was not yet settled and determined.

On January 29, 1926, the Commissioner advised the collector that as a result of an examination of the records of his office an error had been discovered in the amount of the overassessment in favor of plaintiff for 1917, as heretofore shown by the schedule of overassessments, and that the correct amount of the overassessment was $2,328,553.12 instead of $2,366,501.02; that is, he reduced the amount of the overassessment $37,947.90. In the same communication the Commissioner advised the collector that appropriate correction should accordingly be made in his account. Upon receipt of this direction, the collector, on January 30, 1926, charged plaintiff's account on his books with the amount of the error, namely, $37,947.90, and issued a notice and demand for its payment. Upon receipt of the notice and demand, the plaintiff protested to the Commissioner against the adjustment, contending that the change had been made in a greater amount than should have been made, and the Commissioner, on March 3, 1926, advised the collector to cancel the charge which had been made pending further consideration of the item by his office and that he would be advised later as to the final adjustment to be made. Accordingly, on March 31, 1926, the collector credited plaintiff's account for 1918 with $37,947.90 from the overassessment of 1917, thus restoring the status of the credit on the 1918 taxes to what it was before he made the charge on January 30, 1926.

In accordance with a notice given to the Accounts and Collections Unit, the Commissioner, on April 1, 1926, on further consideration, advised the collector that the correct adjustment which should be made in connection with the overassessment for 1917 was a decrease of $7,215.59 in the amount originally shown, thus reducing the overassessment from $2,366,501.02 to $2,359,285.43, and that an appropriate charge should be made against plaintiff's account

for that amount. This was done by the collector accordingly on April 30, 1926, and the sum of $7,215.59 was paid by plaintiff September 21, 1926.

It appears from what has been said above that the evidence shows, not only that plaintiff's account had not been finally settled and determined, but that changes and corrections were being made in it by direction of the Commissioner down to April 1, 1926. Even then there had been no computation of the interest due plaintiff, and until this last entry was determined the account had not been in a condition for its correct computation. The word "final" ordinarily means "last," and also in legal parlance means "conclusive." If entries are made in an account and are subsequently changed so as to alter the balance due, the prior entries, in our opinion, cannot be final. If we consider only plaintiff's account on the collector's books, it was not finally closed until an entry had been made as directed by the Commissioner on April 1, 1926, which was after the 1926 Revenue Law went into effect.

In United States v. Swift & Company, supra, the Supreme Court said: "The final act, so far as the taxpayer is concerned, is the receipt from the collector of the certificate showing how the overassessment has been applied." This certificate may be sent either by the collector or the Commissioner, but is usually signed and sent by the Commissioner himself or some one authorized to act for him.

Upon the consideration of the case as originally submitted, the court discovered that the interest allowed on the 1917 overpayment had not been computed in accordance with the credits made, and that apparently there was also an error in the computation of the interest on the 1916 overpayment. The court also found that the evidence was incomplete in certain respects. Pursuant to an order made by the court, the parties executed an agreed statement of facts supplementing the testimony which had been taken and the agreements theretofore made. Plaintiff also filed an amendment to its petition and a supplemental brief.

It is now argued in the supplemental brief filed on behalf of plaintiff that, as both the 1916 certificate and the 1917 interest schedule and notice of interest allowance were erroneous in certain respects, they do not evidence the Commissioner's determination, nor can their delivery be taken as showing the date of his final determination of plaintiff's tax account. Even if it should be conceded that this argument was sound, it would not help plaintiff's case. There would then be no final determination and the court would have to make it. Clearly under such circumstances the plaintiff would not be entitled to have the interest computed under the 1924 statute.

We are not, however, disposed to agree with this contention. When a decision is made and announced by the Commissioner, it remains a decision, even though it may be in part erroneous. In the case at bar there was not at any time an error in the final determination of the amount of the overassessment and credit. On March 27, 1926, the amount of the overassessment for 1917 was stated to be $2,359,285.43. On the same day a notice of interest allowance was prepared and addressed to the plaintiff, but it was not delivered to plaintiff until November 22. In this notice the credit is fixed at the same sum, and the communication to plaintiff dated April 6, 1926, showed that this same amount of overassessment for 1917 was all credited on taxes of other years, although part of it is shown as having been erroneously credited to the taxes of 1920. The credit of $93,726.71 to the taxes of 1920 shown therein was obviously a mistake or oversight—so obvious that no attention was paid to it in the final settlement. As plaintiff's tax account was settled on the basis that this amount had been credited on the taxes of 1918 and the error would not affect the amount of the credit, we think it may be disregarded in determining when the credit was finally allowed. In any event, the error that was made as to the interest will not require that its computation be now made under the 1924 act.

The Revenue Act of 1926 went into force February 26 of that year, and, if the Commissioner made his final decision as to the allowance of the overpayment for 1917, and the credits to be made therefrom subsequent to that date, the provisions of the 1926 act must control in the computation of the interest due plaintiff on the 1917 overpayment.

The proceedings that have been set forth above show that, after the 1926 act went into effect, changes were still being made in the amount of the 1917 overpayment and credits therefrom on the books both of the collector and the Commissioner. On March 27, 1926, the assistant to the Commission-

er advised the Accounts and Collections Unit that the correct adjustment which should be made in connection with the overassessment for 1917 was a decrease of $7,215.59 in the amount originally shown; thus reducing the overassessment from $2,366,501.02 to $2,359,285.43. At the same time a notice of interest allowance was prepared in which the interest allowable was computed as $131,877.81. This computation was in accordance with that set out in the letter of April 6, 1926, referred to in finding 17 and further on in this opinion. April 1, 1926, the Commissioner advised the collector that an appropriate charge should be made against plaintiff's account for $7,215.59, and such charge was made by the collector on his books April 30, 1926. That additional amount was paid by plaintiff September 21, 1926, and by this payment plaintiff's tax account (not including interest) for 1917 was completely and finally settled.

April 3, 1926, the Commissioner signed a schedule pertaining to the interest due plaintiff. The blank which was used in preparing it was the ordinary form for a schedule of refunds and credits and was so headed, but the schedule showed only the amount of interest due plaintiff amounting to $131,877.81 and that this amount was payable. It also contained a statement authorizing the disbursing clerk of the Treasury to issue a check to plaintiff for that amount. April 6, 1926, the communication set out in finding 17 was sent from the Commissioner's office to plaintiff. It contained an itemized statement of the account between plaintiff and defendant on taxes for 1917. It showed the amount of the overassessment, which was $2,359,285.43, also the several amounts credited therefrom upon taxes of specified years and the manner in which interest had been computed under the Revenue Act of 1926; the total amount of such interest being as stated in the notice referred to above, namely, $131,877.81. In accordance with this statement, interest in this amount was paid to plaintiff about November 22, 1926. Plaintiff received it under protest claiming that the interest should have been computed under the act of 1924.

About April 22, 1926, the Commissioner mailed to plaintiff the certificate of overassessment for 1917 referred to in findings 7 and 9, and it was received by plaintiff April 23, 1926. It contained recitals to the same effect with reference to the amount of the overpayment of the 1917 taxes and its application upon taxes of other years as had been set out in the communication of April 6, 1926. It also showed that the overassessment had been originally determined at $2,366,501.02 and that a change had been made in the amount credited to the additional assessment for 1918 from $2,241,746.92 to $2,234,531.33 by reason of the reduction of $7,215.59 referred to above. The interest computation was not shown on the certificate, and no correction was made on account of the transfer of $93,726.71 against the original assessment for 1920 to the additional assessment for 1918. The interest was finally paid by defendant to plaintiff on this item of $93,726.71 on the basis of its application to the original assessment for 1920, although in fact it never was applied thereon. This certificate consisted of two sheets. Each of these two sheets was headed "Certificate of Overassessment," and each was signed by a division head on behalf of the Deputy Commissioner or Assistant Commissioner.

Some time after April 23, 1926, and prior to May 6, 1926, the Commissioner mailed to the collector the notice of interest allowance to which we have made reference above, together with a check dated April 28, 1926, for $131,877.81. After the collector had notified the plaintiff with reference to the necessary certificate as to taxes of other years and such certificate had been received by the collector, the notice of interest allowance and the check for $131,877.81, as stated therein, were delivered to the plaintiff by the collector on November 22, 1926, as stated above.

It will be observed from what has been recited above that from and after March 27, 1926, no change was made in the amount allowed on the overpayment for 1917 or the amount to be credited on the taxes of other years; that from and after April 22, 1926, when the certificate of overassessment was sent out, the Commissioner took no further action in the way of stating or determining the amount due the plaintiff on account of the overpayment of the 1917 taxes. It might therefore be argued that, when this certificate of overassessment was executed and sent, it constituted a formal approval of the account of the taxpayer for 1917 and final action under the rule laid down in the Swift & Co. Case, supra. But as under the direction of the Commissioner the payment of the interest was withheld by the collector for certification as to other taxes, and plaintiff did not receive the notice of allowance of interest, and pay-

562

ment thereof was not made until November 22, 1926, it may be contended that the final determination was not made until this last-named date. We have, however, no occasion to determine the precise date when the final action of the Commissioner occurred under the peculiar facts in the case, as we are clear that it could not have been earlier than March 27, 1926.

In plaintiff's supplemental brief to which reference has heretofore been made, it is contended that, even if the interest on the 1917 overpayment should be computed under the 1926 act, plaintiff has been paid much less than the amount to which it is entitled. In the supplemental brief, plaintiff sets out what it claims to be the correct computation of the interest under the 1926 act in accordance with the decision of this court in the case of Standard Oil Co. (Indiana) v. United States, 5 F. Supp. 976, 7 F. Supp. 301, 78 Ct. Cl. 714. This computation shows that there is still due the plaintiff as interest on the 1917 overpayment the sum of $79,415.14, and the court understands that practically the same result has been reached by the accountants of the Bureau of Internal Revenue. The court also finds that an error was made in computing the interest on the 1916 overpayment, and there is still due $3,823.96, making a total of interest due the plaintiff of $83,239.10. It is conceded that the computation of interest on the 1916 overpayment should be made under the 1924 act.

It is urged, however, on behalf of defendant as a final and complete defense, that, when it is sued for interest, it is entitled to offset interest upon the 1918 deficiency from the time the tax for that year became due until the time it was paid either by credit from the 1917 overpayment or by cash, and in support of this position the case of Billings v. United States, 232 U. S. 261, 286, 34 S. Ct. 421, 426, 58 L. Ed. 596, is cited. This case was decided February 24, 1914, when there were no statutory provisions as to interest on deficiencies. In the lower court it was an action to recover a tax due under the Tariff Act of 1909 (36 Stat. 11). The United States sued for the amount of tax with interest, thus making it an action in which the tax was treated as a debt. The Supreme Court held that, although the rule in the state court was that no interest could be allowed upon a tax except under a statutory provision, the rule was otherwise with reference to taxes due the United States, as to which

interest might be allowed "in all cases where equitably due unless forbidden by statute." It may be conceded that interest was equitably due the government on the deficiency of 1918 from the time it should have been paid under the statute, and, if the Government is allowed to offset the amount of such interest, there would be nothing due plaintiff.

We do not think, however, that the decision in Billings v. United States, supra, is applicable to the case now before this court. It will be observed not only that the case as presented to the lower court was one to recover a debt but that the Supreme Court did not hold that the rule above stated should be applied when there was a statute to the contrary. In order to determine what the law was at the time when the Commissioner made the computation of interest, it is necessary to examine the revenue acts imposing income and profits taxes which had been enacted up to that time. Prior to the 1921 act there was no statutory provision for interest on deficiencies until they were assessed, possibly because the penalties prescribed for deficiencies due to fraud and negligence were regarded as sufficient compensation. In cases where these penalties were not assessable, there was no provision for reimbursing the government for interest on account of the amount of underpayment from the time it was legally due, and the Bureau of Internal Revenue treated the situation as one in which no interest could be collected. The 1921 act recognized the inequity of this situation, and for the first time, in section 250 (b), 42 Stat. 264, authorized the collection of interest on deficiencies in favor of the government, but the interest provisions of the 1921 and 1924 acts were applicable only to deficiencies which occurred under their respective provisions. There was nothing in these acts that made deficiencies occurring prior to the 1921 act bear interest until they were assessed. But the 1926 act in section 283 (d), 26 USCA § 1064 (d), contained a provision with reference to deficiencies under acts prior to the 1921 act which were assessed after the enactment of the 1926 act which made these deficiencies bear interest at the rate of 6 per cent. per annum only from the date of the enactment of the 1926 act instead of from the original due date of the tax. We think it clear that by the enactment of these statutes Congress intended to establish a rule for the allowance of interest upon deficiencies. The provisions of these acts, especially those contained in the 1926 act,

show plainly that Congress did not intend that deficiencies arising under acts prior to the 1921 act should bear interest unless they were assessed after the enactment of the last-named statute. In the case at bar the deficiencies were assessed on May 15, 1925, and were for the years 1909 to 1914, inclusive, and 1918, and we have hereinabove held that the overpayment for 1917 was allowed, the credits made, and interest computed after the 1926 act went into effect. We think the interest must be computed in accordance with the statutory law then prevailing, which, being different from the rule laid down in the Billings Case, supra, makes that decision inapplicable.

As bearing on the application of the decision in the Billings Case, it may be observed that as stated above the action was one in which the United States brought suit to recover the tax as a debt, and in the case now before the court no counterclaim or offset is pleaded.

It must be conceded that plaintiff's case is devoid of equity, for, if interest was charged to plaintiff on deficiencies in its taxes from the time they became due, the amount thereof would far exceed even the $867,834.22 claimed in plaintiff's original petition. In short, the plaintiff is claiming interest for a period during which it was indebted to the government, but this does not authorize us to set aside express provisions of the statute. On the other hand, a situation is presented under which we can indulge in no presumptions in favor of plaintiff in order that it may obtain judgment for the huge sum asked in its original petition.

It follows from what has been stated above that plaintiff should be awarded judgment for $83,239.10, and it is so ordered.

BOOTH, Chief Justice, and WHALEY and WILLIAMS, Judges, concur.

LITTLETON, Judge (dissenting).

I am of opinion that the credit of the 1916 and 1917 overpayments was made and allowed to the 1918 deficiency under the Revenue Act of 1924 and that plaintiff is entitled to interest on the overpayments computed in accordance with the provisions of that act to the date of the additional assessment for 1918. I think, also, that the decision in this case is contrary to the opinion in Standard Oil Co. (Indiana) v. United States, 5 F. Supp. 976, 7 F. Supp. 301, 78 Ct. Cl. 714, and other decisions on the

subject of interest on credits. Moreover, it seems to me that the principle of account settled, applied in recent cases in this court, should be applied to the transactions between the parties culminating in the telegram of the Commissioner of Internal Revenue of July 20, 1925, the action of the collector on July 27, 1925, and the payment, on the same day, of the balance, all of which was known to the Commissioner, who acquiesced therein by instructing that the same be done. I see no reason why the Commissioner may not legally approve a credit and make it final and binding under the statute before the collector makes his entries as well as afterwards if he elects, as I think he did in this case, to give specific instructions as to how the overpayments and deficiencies should be applied and takes no further action. Cf. Royal Bank of Canada v. United States, 44 F.(2d) 249, 70 Ct. Cl. 663; Revolution Cotton Mills v. United States, 41 F.(2d) 898, 71 Ct. Cl. 12.

In none of the decided cases involving the allowance of a credit has any controlling importance been attached to the certificate of overassessment, although defendant relied upon it as the final act of allowance. Pottstown Iron Co. v. United States (Ct. Cl.) 40 F.(2d) 142; Id., 282 U. S. 479, 51 S. Ct. 205, 75 L. Ed. 472; West Leechburg Steel Co. v. United States (Ct. Cl.) 40 F.(2d) 131; Atlas Powder Co. v. United States (Ct. Cl.) 40 F.(2d) 136.