**JIM BOUTON CORPORATION, a New Jersey Corporation, Plaintiff–Appellee,**

v.

**WM. WRIGLEY JR. COMPANY, a Delaware Corporation, and Amurol Products Company, an Illinois Corporation, and subsidiary of Wm. Wrigley Jr. Company, Defendants.**

**Appeal of AMUROL PRODUCTS COMPANY.**

**No. 560, Docket 89–7805.**

United States Court of Appeals, Second Circuit.

Argued Jan. 10, 1990.
Decided May 3, 1990.

Steven B. Pokotilow, New York City (Blum Kaplan, Anita K. Yeung, New York City, of counsel), for plaintiff-appellee.

John G. Koeltl, New York City (Jonathan H. Hines, Colby A. Smith, Debevoise & Plimpton, New York City, of counsel), for defendant-appellant.

Before VAN GRAAFEILAND, CARDAMONE and ALTIMARI, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Amurol Products Company appeals from a judgment of the United States District Court for the Southern District of New York which followed a nonjury trial before Judge Leisure. The judgment awarded Jim Bouton Corporation (JBC) substantial damages and gave it injunctive relief in its action for breach of contract. It also dis-

missed Amurol's counterclaim seeking recovery against JBC on a theory of unjust enrichment. We reverse those portions of the judgment that awarded damages and granted injunctive relief to JBC. We affirm the dismissal of Amurol's counterclaim. We also affirm the dismissal of the causes of action asserted in Counts II and III of JBC's amended complaint.

Jim Bouton, a former major league baseball player, is president and 50 percent shareholder of JBC. The only other shareholder is Rob Nelson, a former teammate of Bouton. Amurol, a wholly-owned subsidiary of Wm. Wrigley, Jr. Company, which was relieved of liability by the district court, is engaged in the manufacture of candy, gum, and other food products. Bouton and Nelson formed JBC in 1979 to capitalize on their idea of marketing bubble gum that resembles chewing tobacco. In 1979, Bouton filed a trademark application for "BIG LEAGUE CHEW," shredded bubble gum packaged in a pouch. JBC's agent contacted Amurol about marketing the product. Amurol already had developed the concept of shredded bubble gum, but expressed interest in using the BIG LEAGUE CHEW trademark. The parties entered into a series of licensing agreements which culminated in a formal agreement signed in June 1982, but effective as of July 1981 (the 1981 agreement).

Under the agreement, JBC was to receive royalties on Amurol's sale of BIG LEAGUE CHEW. The royalties were calculated on a sliding scale, 2.5 percent for the first $20 million in sales, 3.5 percent on the second $20 million, and 5 percent on sales over $40 million. JBC retained the right to approve all advertising. Finally, the document provided that it was the entire understanding between the parties and could not be modified except in writing.

Bouton, as president of JBC, frequently objected to proposed advertising. However, because Amurol sometimes did not consult Bouton until substantial time and money had been invested in a particular advertising program, on at least two occasions Bouton consented to advertising he did not like, reserving the right to exercise

disapproval during the ensuing season. In 1984, a dispute arose over a promotional campaign based on a "Baseball Bonanza" giveaway game. Amurol organized the campaign, announced its use to its brokers, and purchased media time for commercials, but Bouton refused to consent to the format. A.G. Atwater, an Amurol executive, contacted Bouton by telephone on February 22, 1984, to try to obtain his consent. After some discussion, they orally agreed that JBC would relinquish advertising approval rights in return for a flat 5 percent royalty on all sales of BIG LEAGUE CHEW. Atwater further agreed orally that Amurol would refrain from marketing any other shredded bubble gum that would compete with BIG LEAGUE CHEW, but that Amurol could continue to sell two products, "BUCKAROO CHEW" and "POPEYE", which already were on the market. Bouton then gave his approval to run the Baseball Bonanza advertising campaign.

Following this oral conversation, Atwater sent Bouton a mailgram dated February 22, 1984, which read as follows:

> This is the text we talked about. Will be in touch with Gilson to draw up final papers next week.
>
> If Amurol Products Company elects to continue advertising, it will create and run advertising for BIG LEAGUE CHEW with a masculine sports theme featuring the brand in a quote macho unquote image.
>
> If promotional advertising is run, it will make every attempt to feature the brand in the same image.
>
> Any promotions to the consumer will continue to feature prizes which are sports-oriented and in keeping with the image of the brand.
>
> Amurol, in consideration of Jim Bouton Corporation relinquishing all approval of advertising and promotions, will, during the life of the contract, refrain from introducing another quote shredded unquote bubble gum which would compete with BIG LEAGUE CHEW. POPEYE and BUCKAROO CHEW, already on the market can continue to be produced and sold.

JBC's contention, as set forth in the Amended Pre Trial Order, is that it entered into a "valid binding and enforceable agreement" with Amurol on February 22, 1984, the terms and conditions of which were "set forth, memorialized, and incorporated" in the February 22 mailgram. Although the district court's opinion is somewhat obscure on this point, a fair reading of it indicates that the district court agreed. We disagree.

■ The 1981 agreement, in which millions of dollars were at stake, contains thirty-three paragraphs and takes up seventeen pages of the printed appendix on appeal. The parties, experienced in the ways of business, simply could not have intended that the cursory mailgram message, which did not even discuss a change in plaintiff's substantial royalties, constituted a legally enforceable modification of the carefully prepared 1981 contract. The mailgram's reference to the drawing up of "final papers" by Amurol's lawyer evidences a clear intent to the contrary. The word "final" has the commonly understood lay meaning of "conclusive," "decisive," or "definitive." *Webster's Third New International Dictionary* 851. In legal parlance, its meaning is substantially the same. *See People v. Gaggi*, 104 A.D.2d 422, 424, 478 N.Y.S.2d 732 (1984) (mem.); *Standard Oil Co. v. United States*, 81 Ct.Cl. 174, 10 F.Supp. 550, 560 (Ct.Cl.1935); *Black's Law Dictionary*, 757 4th ed.

The conduct of the parties which followed the dispatch of the mailgram demonstrates that they recognized the need for a conclusive, decisive and definitive document prepared by, or under the supervision of, their lawyers. At Bouton's request, a copy of the mailgram was sent directly to James Silberman, JBC's lawyer, and Silberman was JBC's spokesman in most of the negotiations that followed. Silberman promptly questioned the absence of any provision in the mailgram for increased royalties and also informed Atwater that JBC wanted to retain the right to restrict the use of the package in connection with the sale of other products and to approve package graphics. Moreover, although in

the final paragraph of the mailgram JBC is said to have relinquished all right to approve advertising and promotions "during the life of the contract", Atwater believed it necessary to obtain a letter from Silberman specifically approving the Baseball Bonanza commercial. On February 28, 1984, Silberman sent Atwater a letter reading as follows:

You have requested written confirmation that Amurol can use for 1984 the TV advertisement previously submitted to Jim Bouton based on the understandings as to modification of the Agreement which is to be reduced to writing in due course.

Part of the understanding is set forth in your Mailgram of February 22, 1984. The understanding is also based on the following conditions:

1. Relinquishment of approval of advertising and promotion covers all "Articles" (BIG LEAGUE CHEW shredded bubble gum and BIG LEAGUE PLUG candy).

2. On all sales of "Articles" for the period January 1, 1984 through the end of the Agreement, the payment under paragraph 4 will be five percent (5%) on Net Sales.

3. Relinquishment of approval of advertising and promotion shall not be construed as a relinquishment of any other rights that JBC has under the Agreement including:

(a) the right to prohibit use of the package (exterior or within the pouch) to sell another product without a separate agreement; and

(b) the right to approve package graphics.

If your understanding comports with the above, we will operate on the assumption that an acceptable writing will come into being and, on behalf of The Jim Bouton Corporation, I hereby give Amurol authorization to run the TV ad for 1984.

JBC's contention, as set forth in the Amended Pre Trial Order, is that the foregoing letter "reiterated and clarified" the terms of the mailgram and incorporated "related conditions" that were "implied" in the mailgram. This simply is not so. Silberman's letter recognized that only "[p]art of the understanding" was contained in the mailgram. In addition to the royalty provisions, which were not referred to at all in the mailgram, Silberman's letter proposed that JBC would retain the right to restrict the use of the gum packages and their graphics or appearance, two additional matters concerning which the mailgram was completely silent. Moreover, the authorization given for the Baseball Bonanza commercial was only for the year 1984, not for the "life of the contract," thus indicating that JBC was acting under the assumption that it had not relinquished its right to reject other advertisements or this one in the years following 1984. Lastly, and most importantly, an "acceptable writing" between the parties was not to come into being unless the contents of the letter met with Amurol's approval. Significantly, the contents did not meet with Amurol's approval. *See Willmott v. Giarraputo*, 5 N.Y.2d 250, 253, 184 N.Y.S.2d 97, 157 N.E.2d 282 (1959). As summarized below, the parties negotiated for nine months in an unsuccessful effort to arrive at an "acceptable writing."

When Amurol's attorney, Jerome Gilson, reviewed the mailgram and Silberman's letter, he immediately questioned the legality under the antitrust laws of Amurol's proposed covenant not to compete. On March 19, 1984, Gilson orally conveyed his misgivings to Silberman, and Silberman promised to prepare a draft letter incorporating the terms of the supplemental agreement. On April 17, 1984, and again on May 18, 1984, Gilson wrote to Silberman inquiring about the promised draft. On June 8, 1984, Silberman sent Gilson the draft of a proposed "Amendment to Agreement."

Although the "Whereas" clauses of a contract do not determine its operative effect, they do furnish a background in relation to which the meaning and intent of the operative provisions can be determined. The "Whereas" clauses of Attorney Silberman's draft are illuminating. The first clause states that JBC and Amurol are

parties to the 1981 agreement (not a February 1984 agreement). The second states that the parties "desire to amend" the 1981 agreement (not that they already have amended it). Despite the objection that Gilson already had voiced to the anticompetitive clause, Silberman included a provision in his draft to the effect that Amurol would not introduce and market in the United States and Canada "a shredded bubble gum which will compete with the BIG LEAGUE CHEW Brand," excepting from the anticompetitive clause only the PO-PEYE and BUCKAROO CHEW brands that Amurol already was marketing.

JBC's desire to eliminate competition proved to be a stumbling block throughout the entire nine months of negotiation. On June 19, 1984, after Attorney Gilson had had an opportunity to review Attorney Silberman's draft, he made several adverse comments about it in a letter to Atwater. Referring to the anticompetitive clause he said:

> As I mentioned to you previously, that for antitrust reasons, I am uncomfortable with a no-compete clause of this type. I tried to talk Silberman out of it several months ago, but he either forgot or is unwilling to concede. As I see it, we have two choices: delete it or ask Gordon Lang for an antitrust opinion. If he approves it, I have no problem with it. Shall I give him a call? If it stays in, the rest of the paragraph, which allows shredded gum to be sold outside the U.S., looks acceptable.

Referring to the clause which prohibited Amurol from using the interior or exterior of the package or container to sell other products without a separate agreement with JBC, Gilson said:

> This was mentioned in his letter of February 28, 1984, but not in your telex of February 22, 1984. This is another form of no-compete clause which sounds very risky, as though JBC owned a patent on the pouch *and* the display container. Thus, until probably 1993 you would have to pay tribute to JBC if you wanted to sell another pouch product (interior or exterior) or use the retail display contain-

er for another novelty item. This seems very harsh to me, although I do not see a serious antitrust problem. Should we discuss it?

With Atwater's approval, Gilson then sought advice from Attorney Gordon Lang, a specialist in the field of antitrust. The letter read in pertinent part as follows:

> You will recall we talked last week about the no-compete clause being requested of Amurol in a trademark license amendment. Since then I tracked down Jim Silberman, attorney for Bouton, and unsuccessfully attempted to persuade him to drop this demand. He contended that it was an important point. Accordingly, the question is ripe for your advice.
>
> \*    \*    \*    \*    \*    \*
>
> What do you think about its legality? A.G. wants to wrap up the amendment promptly. Could you get back to me in a few days?

On August 14, 1984, Attorney Lang responded to Gilson's request in part as follows:

> Particular caution should be exercised in the case of Amurol since it is owned by Wrigley, the dominant manufacturer of chewing gum in the United States. The restriction on marketing other types of shredded bubble gum could be made the object of antitrust attack because it may foreclose marketing opportunities to other persons who might wish to sell their ideas for the manufacture or marketing of shredded bubble gum to Amurol or Wrigley, thereby constituting a substantial restraint of trade under § 1 of the Sherman Act, 15 U.S.C. § 1 (1982). There are numerous cases in the ordinary distribution context which hold that foreclosure of even 15–25 percent of the total number of distribution outlets constitutes an illegal restraint of trade. [citations omitted]. Wrigley's share of the chewing gum market is considerably higher than the 15–25 percent threshold, and its share of the shredded bubble gum market is even higher yet. To the mischievous antitrust treble damage plaintiff, this combination of facts and

circumstances presents an opportunity for costly and time-consuming litigation against Amurol, Wrigley and JBC. For these reasons, it is advised that the proposed restriction be eliminated from the draft amendment to the Agreement between JBC and Amurol.

Mr. Lang continued:

In the event that JBC wishes to share in the profits derived from the sale of types of shredded bubble gum other than BIG LEAGUE CHEW, this could well be done by offering JBC a royalty from the sales of all kinds of shredded bubble gum marketed by Amurol in return for JBC having provided Amurol with valuable and constructive ideas, know-how and advice related to the development, manufacture and marketing of shredded bubble gum. This would constitute a form of compensation for the original contribution that JBC made to the shredded bubble gum product which Amurol developed with the close cooperation and assistance of JBC.

On August 20, 1984, Gilson wrote to Silberman, reminding him of the fact that in addition to the 1981 agreement with respect to the BIG LEAGUE CHEW and BIG LEAGUE PLUG (candy) trademarks, there was an entirely separate agreement covering the trademark "BUCKAROO CHEW" [dated November 11, 1980] due to expire on September 15, 1984. He suggested that the two agreements be consolidated and enclosed a proposed draft to that effect. With respect to Silberman's proposed anticompetitive clause he wrote:

We have consulted with Amurol's outside antitrust counsel with respect to the following language contained in the agreement you drafted:

During the Term of this Agreement, the Company will not introduce and market in the Territory a shredded bubble gum which will compete with the BIG LEAGUE CHEW Brand.

Our client is unable to agree to this provision as drafted. As an alternative, AG has agreed that Amurol will pay to Bouton 5% royalties on any competitive shredded bubble gum product that Amu-

rol should sell, in payment for the services rendered by Mr. Bouton in the initial stages of development of the shredded bubble gum product. I believe this provision will avoid the potential for an antitrust challenge to the non-compete clause you originally drafted. Thus, we have included such a provision in the proposed Amendment.

Please review this Amendment with Mr. Bouton and let us have your comments as soon as possible. In light of the expiration of the BUCKAROO CHEW agreement on September 15, 1984, we would certainly like to finalize this matter at the earliest opportunity.

The amendment as proposed by Gilson read as follows:

Subject only to the provisions of paragraph 8 of the BIG LEAGUE CHEW Agreement, JBC acknowledges that the Company has the right to market outside of the Territory without obligation to JBC Articles which do not utilize trademarks, themes and Property covered by the Agreements, and that the Company is the owner of all right, title and interest in and to the formula, know-how and trade secrets embodied in or related to shredded bubble gum. However, in recognition of and as payment for JBC's participation in and services rendered in connection with the initial development of the shredded bubble gum product, as to any new shredded bubble gum products introduced and marketed by the Company in the Territory, the Company agrees to pay to JBC five percent (5%) on Net Sales without regard to the volume of Net Sales in a calendar year.

Silberman then countered with the proposal that if Amurol marketed any other shredded bubble gum products, it would pay 5 percent royalties to JBC and that any trademarks used by Amurol in connection with these other shredded bubble gum products would be owned by JBC upon termination of the agreement. On this proverbial rock, the ship of compromise foundered. In a letter to Silberman from Susan Neal, one of Gilson's partners, Mr. Atwa-

ter's reaction to Silberman's proposal was summarized as follows:

> Following our telephone conversation of October 1, 1984, I had an opportunity to discuss your most recent proposals with Mr. Atwater. As I was unable to reach you by phone, I am taking this opportunity to advise you as to Mr. Atwater's reaction.
>
> Amurol is not opposed to entering into a separate agreement which provides for payment of 5% of net sales on future shredded bubble gum products. However, Mr. Atwater indicated that Amurol would "absolutely not" agree to Bouton's ownership of any trademarks used in connection with such products upon termination of the agreement. Aside from this one provision, however, I believe the principals are in agreement and we should be able to finalize this matter prior to the current expiration date of November 1, 1984.
>
> Please let me hear from you at your earliest convenience.

On November 26, 1984, recognizing that "Amurol and Jim Bouton have been unable to reach an agreement as to a modification of the 1981 BIG LEAGUE CHEW agreement," Gilson terminated further discussions concerning a proposed modification.

We are satisfied that both sides negotiated in good faith for a written amendment of the 1981 contract, and we can see no purpose or intent in those lengthy negotiations if a binding amendment already had been agreed upon. Our review of the record, much of which is in the form of written documents, leaves us with the definite and firm conviction that the district court erred in holding otherwise. *See Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 261 (2d Cir.), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984).

■ The 1981 agreement provided that its terms could not be waived or modified "except by an agreement in writing." Recognizing that the mailgram did not contain all the necessary material terms, JBC contends that the mailgram and Silberman's letter of February 28, 1984 "together" constitute such an agreement. The

fallacy in this argument is that the February 28 letter was not an agreement, but was instead a counterproposal that never was agreed to. As the mailgram anticipated the preparation by Amurol's attorney of "final papers", Silberman's letter contemplated the future preparation of an "acceptable writing." The above detailed recitation of facts discloses that a writing acceptable to both parties never was prepared. This being so, the 1981 contract's requirement of an "agreement in writing" and New York's statutory requirement of an agreement "in writing and signed by the party against whom enforcement of the change is sought" (General Obligations Law § 15–301(1)) have not been met. *See DFI Communications, Inc. v. Greenberg*, 51 A.D.2d 403, 381 N.Y.S.2d 880 (1976), *modified*, 41 N.Y.2d 602, 394 N.Y.S.2d 586, 363 N.E.2d 312 (1977) (Court of Appeals agreed with Appellate Division that a note or memorandum of an agreement is insufficient to satisfy the requirements of section 15–301, but held that corporate minutes containing the "complete amendatory agreement" and signed by the secretary of the company against whom enforcement of the change was sought met the statute's requirements); *Bakhshandeh v. American Cyanamid Co.*, 8 A.D.2d 35, 37, 185 N.Y.S.2d 635 (1959), *aff'd*, 8 N.Y.2d 981, 204 N.Y.S.2d 881, 169 N.E.2d 188 (1960) (mem.); *Elmsford Sheet Metal Workers, Inc. v. Shasta Indus., Inc.*, 103 A.D.2d 764, 477 N.Y.S.2d 391 (1984) (mem.).

Applying general principles of contract law, we arrive at the same result, viz., that there was no binding contract of amendment. As the Supreme Court observed in *United States v. Line Material Co.*, 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701 (1948), "[p]ublic policy has condemned monopolies for centuries." *Id.* at 308, 68 S.Ct. at 561. That feeling exists in large measure to this day. "Since competition is generally held to benefit the public, any reduction in competition must be considered against the public interest." *Dellwood Foods, Inc. v. Kraftco Corp.*, 420 F.Supp. 424, 428 (S.D. N.Y.1976). Where, as here, a corporation and its parent company occupy a dominant

position in a commercial field, it is logical to expect that experienced businessmen and knowledgeable lawyers will be concerned about entering into a contract that might restrict competition in that field. It is not at all surprising that Amurol's antitrust counsel recommended that Amurol refrain from becoming a party to such a contract.

Troubled by cases such as *Dictograph Products, Inc. v. Federal Trade Commission*, 217 F.2d 821 (2d Cir.1954), *cert. denied*, 349 U.S. 940, 75 S.Ct. 784, 99 L.Ed. 1268 (1955), counsel opined that even if a "mischievous antitrust treble damage plaintiff" could not be assured of success, the combination of circumstances "presents an opportunity for costly and time-consuming litigation...." Without assuming to decide whether a suit by such a plaintiff against the parties herein would be successful, we are satisfied that Amurol's attorneys used good legal judgment in advising Amurol to avoid the problem. We also are satisfied that Amurol used good sense in following its attorneys' advice and that nothing in the dealings between the parties hereto prohibited them from so doing.

■ New York follows the generally accepted rule that when parties negotiating a proposed contract express an intent not to be bound until their negotiations have culminated in the execution of a formal contract, they cannot be held bound until that event has occurred. *See R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir.1984); *Scheck v. Francis*, 26 N.Y.2d 466, 469–70, 311 N.Y.S.2d 841, 260 N.E.2d 493 (1970); *Brause v. Goldman*, 10 A.D.2d 328, 332, 199 N.Y.S.2d 606 (1960), *aff'd sub nom. Brause v. Marshall*, 9 N.Y.2d 620, 210 N.Y.S.2d 225, 172 N.E.2d 78 (1961) (mem.).

Without reiterating the history of the parties' negotiations, we conclude that the undisputed objective facts demonstrate beyond cavil that the parties did not intend to be bound until "final papers" or an "acceptable writing" was prepared and signed. *See Feick v. Fleener*, 653 F.2d 69, 74 (2d Cir.1981) ("Events are moving very rapidly and it will be to the family's advantage if we can formalize our understanding as soon as possible."); *Tebbutt v. Niagara Mohawk Power Corp.*, 124 A.D.2d 266, 268, 508 N.Y.S.2d 69 (1986) (mem.) ("Please advise whether the foregoing terms are satisfactory to your clients and we can proceed to prepare whatever contract documents may be required."); *Rosenzweig v. Salkind*, 5 A.D.2d 58, 60, 169 N.Y.S.2d 213 (1957), *aff'd*, 5 N.Y.2d 902, 183 N.Y.S.2d 82, 156 N.E.2d 712 (1959) (mem.) ("Will you please go over same, and if it is satisfactory, advise me, and I will have them executed, and arrange to meet with you within the next day or two for the purpose of concluding this matter."); *ABC Trading Co. v. Westinghouse Electric Supply Co.*, 382 F.Supp. 600, 602 (E.D.N.Y.1974) ("If your client finds this proposal agreeable in principle, we can proceed to reduce it to a written agreement...."). *See also EDP Medical Computer Systems, Inc. v. Sears, Roebuck & Co.*, 149 A.D.2d 563, 564–65, 540 N.Y.S.2d 18 (mem.), *appeal dismissed*, 74 N.Y.2d 873, 547 N.Y.S.2d 840, 547 N.E.2d 95 (1989); *Gambee v. Argendorf*, 10 Misc.2d 598, 600, 602, 172 N.Y.S.2d 370 (1958).

■ Shortly after Attorney Silberman sent his letter of February 22, 1984, in which he gave Amurol authorization to run the Baseball Bonanza advertisement "for 1984", he contacted Atwater and inquired, "Since we sent you a letter and you are going ahead with the commercial, would you pay an additional 2½ percent?" Amurol complied with this request. JBC contends that this was convincing evidence that the parties had agreed upon all the material terms of an amended contract running to 1988 with an option for a five-year renewal term. Because the payment of the increased royalty is equally, if not more readily, referable to the short term permission to run the specifically named commercial, it cannot be treated as part performance of an agreement covering all commercials during the succeeding four to nine years. *See Wilson v. La Van*, 22 N.Y.2d 131, 134–35, 291 N.Y.S.2d 344, 238 N.E.2d 738 (1968); *Bakhshandeh v. American Cyanamid Co., supra*, 8 A.D.2d at 38, 185

**1082**

N.Y.S.2d 635; *Bright Radio Laboratories, Inc. v. Coastal Commercial Corp.*, 4 A.D.2d 491, 494, 166 N.Y.S.2d 906 (1957), *aff'd,* 4 N.Y.2d 1021, 177 N.Y.S.2d 526, 152 N.E.2d 543 (1958) (mem.).

■ By the same token, we agree with the district court that Amurol was not entitled to the return of the additional 2½ percent royalty when it terminated the negotiations looking toward an amended contract. Since it had the use of the Baseball Bonanza commercial, there was no unjust enrichment here.

We hold also, for the reasons stated by the district court, that JBC's alternate claims in Counts II and III of its amended complaint that Amurol breached the unamended 1981 contract were properly dismissed. Because we hold that JBC is not entitled to any recovery, we do not reach the question whether the district court used the proper measure of damages.

In sum, we reverse the portion of the district court's judgment which holds that JBC and Amurol entered into a binding contract modifying their 1981 agreement and awards damages and grants an injunction based on the district court's modification holding; we affirm the portion of the district court's judgment that denies Amurol recovery on its counterclaim, and we affirm the portion that dismisses the claims asserted in Counts II and III of JBC's amended complaint. No costs to either party.