Irwin A. ZUCKER, Plaintiff,

v.

Stanley KATZ, Judith Katz, Archer Services, Inc., Archer Services of California, Inc., Archer Courier Services of Connecticut, Inc., Archer Services of Chicago, Inc., Archer Services of Massachusetts, Inc., Archer Motor Service of Washington, Inc., Can Carriers, Inc., Archer Motor Service, Inc., and Graphic Transmissions, Defendants.

No. 87 Civ. 7595 (SWK).

United States District Court, S.D. New York.

Nov. 1, 1993.

Broudy & Jacobson by Lee D. Unterman, New York City, for plaintiff.

Paul, Weiss, Rifkind, Wharton & Garrison by Leslie Gordon Fagen, Sara L. Mandelbaum, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

Defendants move for an order, pursuant to Rule 56 of the Federal Rules of Civil Procedure, granting partial summary judgment, or in the alternative, granting their motion to dismiss pursuant to Rule 12(b), with respect to Counts 12, 13 and 14 of the Third Amended Complaint. Plaintiff Irwin A. Zucker ("Zucker") cross-moves for an order, also pursuant to Rule 56 of the Federal Rules of Civil Procedure, granting him partial summary judgment on Counts 12, 13 and 14 of the Third Amended Complaint. The primary issue on this motion and cross-motion is whether Zucker, a former employee of the defendant Archer Services, Inc., can enforce a draft settlement agreement governing, among other things, the sale of stock in two of the defendant companies and the payment of an aggregate $1.1 million, including securities and other consideration. For the reasons that follow, the Court dismisses Counts 12, 13 and 14 of the Third Amended Complaint on the grounds that (1) there is no genuine issue of material fact that the parties intended to be bound by a signed written agreement, which was never executed; (2) in the alternative, Zucker has failed to satisfy the New York Statute of Frauds; and (3) Zucker has failed to plead fraud with the specificity required by Rule 9 of the Federal Rules of Civil Procedure.

## BACKGROUND

Zucker brought this suit against defendants Archer Services, Inc., eight Archer affiliates (jointly, the "Archer Companies"), Stanley Katz ("Katz") and Judith Katz (collectively, "Archer"). The Archer Companies primarily provide delivery and facility management services, ranging from hand deliveries to the development and staffing of inhouse messenger services at national corporations and law firms. Katz is the owner, an officer and a director of the Archer Companies; his wife, Judith Katz, is Secretary of certain of the affiliates. Zucker is an ex-employee and ex-officer of the Archer Companies, whom Katz hired in October 1966.

### A. Zucker's Resignation

Zucker worked as an employee of the Archer Companies for more than twenty years, acting as President and Chief Operating Officer of Archer Services, Inc. and an officer of each of the Archer affiliates. By March 1987, however, Zucker was discontented at Archer Services, Inc. and threatened to resign unless Katz satisfied certain demands, including the transfer to Zucker of a ten percent ownership interest in each of the Archer Companies. Following Katz's rejection of Zucker's demands, Zucker resigned. Soon thereafter, Zucker threatened to sue Katz and the Archer Companies un-

less he was provided with a severance package that included a ten percent interest in Archer stock. The basis of Zucker's demand was his belief that, in or about 1979, Katz had orally promised him a ten percent ownership interest in the stock of the Archer Companies. Although Katz denied making any such promise, he began negotiating a severance agreement with Zucker.

## B. *The Settlement Negotiations*

From early July through early October 1987, the parties engaged in negotiations and drafted a proposed settlement agreement. Zucker retained Clark E. Alpert ("Alpert") and Thomas Ackermann ("Ackermann") of the law firm of Greenberg, Margolis, Ziegler, Schwartz, Dratch, Fishman, Franzblau & Falkin to negotiate with Ernest Rubenstein ("Rubenstein") of Paul, Weiss, Rifkind, Wharton & Garrison, counsel for the Archer Companies.

### 1. *The July Meeting*

On July 10, 1987, the parties and their counsel met to discuss the proposed settlement. The following arrangements were discussed: (1) Zucker would be paid an aggregate of $1.1 million consisting of (a) a specified cash amount; (b) a transfer to Zucker of all of the outstanding capital stock of Archer Services of Massachusetts, Inc. ("Archer Boston") and Archer Services of Chicago, Inc. ("Archer Chicago"); and (c) deferred payment of the balance in certain cash installments over an allotted period of time; (2) the deferred payments would be secured by a pledge of ten percent of the outstanding stock of each of the Archer Companies, except Archer Boston and Archer Chicago; (3) Zucker would receive fifty percent of the net proceeds from the sale of Can Carriers, Inc. ("Can Carriers"), a bicycle messenger service; (4) Zucker and Katz would execute and deliver mutual general releases, thereby relinquishing any and all claims each might otherwise assert against the other; and (5) the parties would execute non-compete covenants, defining the nature of the business.

Following the meeting and based on the discussion between the parties, Rubenstein drafted an outline of the preliminary settlement arrangement. The outline included the settlement amount, the approximate payment schedule, the ten percent pledge of stock as security, the need for provisions regarding rights of first refusal and non-compete covenants, and Zucker's willingness to relinquish all of his interests in, and claims against, the Archer Companies. In addition, the outline also indicated that, pursuant to the July 10th discussions, *all* of the proceeds from the anticipated sale of Can Carriers would go to the Archer Companies, instead of fifty percent to Zucker, as initially proposed. It was further understood that, in the event the parties had not finalized a settlement by the time that a buyer was found for Can Carriers, an escrow agreement would be drafted by Zucker's attorney to govern the proceeds from the Can Carriers' sale.

Thereafter, on or about July 20, 1987, Ackermann told Rubenstein that Zucker wanted $250,000 of the settlement amount to be characterized as compensation for alleged personal injuries suffered by him. Such an allocation, it was argued, would render that portion of the settlement amount nontaxable to Zucker under Internal Revenue Code § 104(a)(2). In response, Rubenstein took the position that, if successfully so allocated, the Archer Companies might not be able fully to deduct the settlement amount under Internal Revenue Code § 162 as an ordinary and necessary expense of carrying on its trade or business. Apparently, this issue was never resolved.

### 2. *The Unsigned Draft Settlement Agreement*

On August 20, 1987, Rubenstein circulated a copy of a 49–page draft agreement, including Exhibits—marked "Draft"—to, among others, Zucker's attorney and Archer's in-house counsel. Although there had been discussions at the July 10th meeting with respect to the settlement amount, this term, as well as the installment payment amounts, were left blank in order to (1) account for the fact that Zucker had aborted a prior, proposed sale of Can Carriers by withholding his signature as a fifty percent record owner; and (2) leave open the possibility that Arch-

er's lost opportunity cost should be reflected in the settlement amount.

Specifically, although a buyer had been found who offered to purchase Can Carriers on terms favorable to Archer, the buyer lost interest when Zucker refused to consent to the sale unless Katz agreed to an outright transfer to him of ten percent of the shares of the Archer Companies. As fifty percent record owner of Can Carriers' stock, Zucker's consent was essential. Thereafter, and simultaneous to the settlement negotiations, Archer continued to try to find a buyer. In or about September 1987, Cycle Services, Inc. ("Cycle Services") expressed interest in purchasing Can Carriers' assets at a price of $205,000—approximately $40,000 less than the purchase price of the first deal.

In addition, at about this same time, Zucker requested that, in lieu of a pledge of ten percent of the stock of each of the Archer Companies, that one hundred percent of the stock of Archer Services of California, Inc. ("Archer California") be used as collateral security for the deferred payments.

### 3. *The September Meeting*

On September 18, 1987, the parties met once again to discuss the settlement. At that meeting, Katz raised the issue of whether the settlement payment should be reduced as a result of Zucker's refusal to consent to the sale of Can Carriers. Zucker reacted angrily to this suggestion, and the meeting ended abruptly.

### 4. *The Revival of Negotiations*

Although the settlement negotiations were in shambles following Zucker's abrupt departure from the bargaining table on September 18th, counsel for both parties resurrected the settlement by suggesting that (1) Katz agree to withdraw his demand for a price concession as a result of Zucker's role in aborting the earlier Can Carriers' sale and agree to use one hundred percent of the stock of Archer California, rather than ten percent of the stock of all of the Archer Companies, as collateral for the deferred payments; and (2) Zucker agree to use Katz's method for valuing the accounts receivable of Archer Boston and Archer Chicago. On or about October 2,

1987, following a series of telephone conversations, the parties agreed to compromise on these two issues. Rubenstein then undertook to prepare another draft.

By this time, the parties were close to resolving most of the major issues between them. In the interim, counsel for Zucker and Katz attempted to finalize the sale of Can Carriers to Cycle Services. To evidence Archer's commitment to the settlement agreement, an escrow agreement was prepared and signed by Katz in order to govern the proceeds of the Can Carriers' sale pending the parties' execution of a final, written settlement agreement. Thus, Zucker and Katz entered into a written Escrow Agreement agreeing, in essence, that if the parties failed to execute a written settlement agreement by October 30, 1987, they would each receive fifty percent of the escrow funds and both retain the right to dispute each other's fifty percent beneficial interest in the Can Carrier proceeds. If, however, the parties were able to deliver to the escrow agent "a fully executed copy of a Settlement Agreement" by October 30, 1987, then the escrow funds would be disbursed "in accordance with the terms and provisions of such Settlement Agreement. ...." *See* Escrow Agreement, annexed to the Affidavit of Ernest Rubenstein, sworn to on Dec. 16, 1991 (the "Rubenstein Aff."), as Exh. "G," at ¶ 3.3. The Escrow Agreement indicated further that the parties had "arrived at a settlement agreement" regarding their disputes. *Id.* at 1.

As the parties approached the final stages of negotiation, a revised draft agreement, dated October 9, 1991, was prepared at Paul, Weiss to reflect the changes agreed to since August 20th. At about the same time, Zucker executed the consents and stock powers necessary to effectuate the sale of Can Carriers to Cycle Services.

### 5. *The Final Breakdown in Negotiations*

On or about October 12, 1987, Alpert told Rubenstein that Zucker demanded that a fully re-drafted and signed written settlement agreement be finalized by October

30th; otherwise, he was "free to walk away from the deal" and file a lawsuit. *See* Time Records, annexed to the Rubenstein Aff., as Exh. "A." Rubenstein, objecting to Zucker's "bullying," responded that he could not complete the work until November 13th and would not work further in light of Zucker's ultimatum. Rubenstein Aff. at ¶ 36. Thereafter, when no agreement was executed by October 30th, Zucker notified Ackermann that he and Archer had "not as of October 30, 1987 entered into a written Settlement Agreement . . . ," and requested the "immediate release of fifty (50%) of the Escrow Funds" plus interest. *See* Letter from Zucker to Ackermann, of 11/3/87 (the "Zucker Letter"), annexed to the Affidavit of Stanley Katz, sworn to on Dec. 16, 1991 (the "Katz Aff."), as Exh. "A." Accordingly, Ackermann released to Zucker a total of $15,097.95 in principal and interest.

## C. *The Instant Litigation*

On October 23, 1987, Zucker filed, but did not serve, an initial complaint asserting some two dozen counts against the Archer Companies, the Katzes, and Archer's accountants, Perelson, Johnson & Rones. Specifically, Zucker alleged that in or about 1979, Katz promised him ten percent of the shares of the stock in each and all of the Archer Companies as additional compensation and consideration for his continued employment. According to Zucker, this promise constituted an enforceable contract which Katz breached.

On October 28, 1987, Zucker served an amended complaint which alleged for the first time that the parties had an enforceable deal, as of October 2, 1987, as a result of the settlement negotiations. Because of a possible diversity problem, however, Zucker filed a Notice of Dismissal Without Prejudice of the amended complaint on January 26, 1988. Thereafter, on March 23, 1988, Zucker served a second amended complaint which was virtually identical to the prior version but for the removal of the nondiverse party. On May 4, 1988, defendants moved to dismiss the second amended complaint.

In its March 1, 1989 Opinion, the Court dismissed Zucker's claims relating to the supposed settlement agreement as barred by the New York State Statute of Frauds, N.Y.Gen.Oblig.L. § 15–501. *See Zucker v. Katz,* 708 F.Supp. 525 (S.D.N.Y.1989). Specifically, the Court found the complaint deficient in two ways: "The complaint . . . does not specify fraud surrounding the settlement agreement itself that would support the estoppel argument. There is also no mention in the complaint of the signed writings that may be considered as satisfaction of the statute of frauds." 708 F.Supp. at 539. However, the Court granted Zucker leave to replead, holding that, to overcome the statutory bar, Zucker must allege the "fraudulent conduct" to which he alluded to in his brief in opposition to the motion to dismiss, and establish the existence of any alleged writings which, taken together, might satisfy the Statute of Frauds. *Id.* at 539.

Thereafter, on March 31, 1989, Zucker filed his third amended complaint, omitting the claims dismissed with prejudice and re-fashioning others. Defendants have answered this pleading by asserting general denials and affirmative defenses, including, lack of standing, unclean hands, and failure to state a claim upon which relief can be granted.

## D. *The Pending Motions*

Pursuant to Counts 12 and 13 of the Third Amended Complaint, Zucker alleges that, as of October 2, 1987, the parties intended to be bound to a settlement arrangement calling for the transfer to Zucker of Archer Boston and Archer Chicago and the payment of $750,000. Zucker alleges further that the "formality of executing a written document embodying the Agreement's terms was not a prerequisite for there to be a binding Agreement." *See* Complaint at ¶ 103. Zucker also alleges that on October 6, 1987, he partially performed by entering into the "Can Asset Transaction Agreement" and the "Can Escrow Agreement." *Id.* at ¶ 104. Accordingly, Zucker demands (1) specific performance of the Agreement; (2) compensatory and punitive damages; and (3) costs.

In Count 14 of the Third Amended Complaint, Zucker alleges that Katz never intended to perform the agreement, but rather, in

order to induce Zucker to consent to the Can Carriers' transaction, "made fraudulent representations, knowing full well that he would not perform them." *See* Complaint at ¶ 117.

### 1. *Defendants' Argument*

Archer now moves for summary judgment with respect to Counts 12, 13 and 14 of the Third Amended Complaint on the grounds that (1) as the parties intended to be bound by a signed written agreement, and no signed agreement was ever executed, the proposed agreement is not enforceable; (2) the draft agreements are insufficient to constitute a writing, and thus, do not satisfy the New York Statute of Frauds; and (3) Zucker has failed to plead fraud with the specificity required by Rule 9 of the Federal Rules of Civil Procedure.

### 2. *Plaintiff's Argument*

Although Zucker concedes that "this is admittedly not a case in which there is a nice neat single document captioned "Settlement Agreement" embodying all of the terms and signed by all parties," *see* Memorandum of Law in Opposition to Defendants' Motion for Partial Summary Judgment and in Support of Plaintiff's Cross–Motion ("Pl. Mem."), at 2, he maintains that the settlement agreement should be enforced because: (1) a series of documents embody all of the material terms of the parties' agreement; (2) he partially performed his obligations under the agreed upon settlement to his detriment and Archer's benefit; and (3) there is a writing, signed by the party against whom enforcement is sought, confirming the fact that the parties had arrived at, and agreed to, a settlement. Zucker has not responded, however, to the alleged deficiency of the fraud claim (Count 14).

### DISCUSSION

### I. Standard of Law

■ Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, establish that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether the movant has met this burden, the Court must resolve all ambiguities in favor of the party opposing the motion. *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1187 (2d Cir.1987) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962)); *Eastway Constr. Corp. v. New York*, 762 F.2d 243, 249 (2d Cir.1985). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), and may discharge this burden by demonstrating an absence of evidence supporting the opponent's defenses on which the opponent would have the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).[1] The burden then shifts to the opponent who must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

■ The opponent must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 15 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir.1986), *cert. denied*, 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151

1. The moving party may rely on the evidence in the record to point out the absence of genuine issues of material fact. *Celotex v. Catrett*, 477 U.S. at 323, 106 S.Ct. at 2552. The moving party does not have the burden of providing evidence to negate the non-moving party's claims. *Id.* As the Supreme Court recently noted, "whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

(1987). To avoid summary judgment, enough evidence must favor the opponent's case such that a jury could return a verdict in its favor. *See Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510 (interpreting the "genuineness" requirement).

## II. The Parties' Intent to Be Bound in the Absence of a Signed, Written Agreement

█ Under New York law, a contract is unenforceable if the parties did not intend to be bound until after the execution of a formal *written* agreement. *Jim Bouton Corp. v. WM. Wrigley Jr. Co.,* 902 F.2d 1074, 1080 (2d Cir.1990), *cert. denied,* 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990); *Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78, 80 (2d Cir.1985); *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 74 (2d Cir.1984); *Scheck v. Francis,* 26 N.Y.2d 466, 311 N.Y.S.2d 841, 842, 260 N.E.2d 493, 494 (1970). "This rule holds true even if the parties have orally agreed upon all the terms of the proposed contract." *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d at 74. On the other hand, however, where the parties do not intend that an agreement must be reduced to writing to be binding, and there are no material terms of the contract left open for negotiation, an informal oral agreement may be binding even if the parties contemplate memorializing their agreement in writing. *Winston v. Mediafare Entertainment Corp.,* 777 F.2d at 80; *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d at 74. Thus, "[w]hat matters are the parties' expressed intentions, the words and deeds which constitute objective signs in a given set of circumstances." *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d at 74.

█ The Second Circuit has set forth four factors to determine whether the parties intended to be bound prior to executing a written contract; namely, whether: (1) either party has expressly reserved the right not to be bound absent a written agreement; (2) there has been partial performance of the contract; (3) all of the terms of the alleged contract have been agreed upon "such that there is literally nothing left to negotiate or settle;" and (4) the agreement at issue is the type of contract that is generally committed to writing. *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d at 75–76; *see also Winston v. Mediafare Entertainment Corp.,* 777 F.2d at 80. These factors may be shown by "oral testimony or by correspondence or other preliminary or partially complete writings." *Winston v. Mediafare Entertainment Corp.,* 777 F.2d at 80 (quoting Restatement (Second) of Contracts § 27 comment c (1981)). Addressing each of these factors in turn, the Court finds that there is no genuine issue of material fact that the parties did not intend to be bound to the settlement agreement prior to the execution of a writing.

## A. Express Reservation Not to Be Bound

█ Although no single factor of the four factors listed above is dispositive, *see R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d at 75, "considerable weight" is placed upon a party's express statement that it intends to be bound only when a written agreement is signed. *Id.* "Courts are reluctant to discount such a clear signal, and it does not matter whether the signal is given during the course of bargaining, or at the time of the alleged agreement." *Id.* Although neither party in the case at hand expressly reserved the right not to be bound prior to the execution of the settlement agreement, the language of (1) the draft settlement agreement; (2) the Can Carriers Escrow Agreement; and (3) communications among the parties' counsel indicate that only a formal signing was intended to give rise to a binding contract.

### 1. The Documentary Evidence

The uncontested documentary evidence clearly establishes that the parties intended not to be bound prior to the execution of a formal written contract. First, the very language of the unsigned draft agreements, dated August 20, and October 9, 1987, make plain that a formal signing was intended to be essential to give rise to a binding contract. *See* Severance Agreement, dated 8/20/87, annexed to the Rubenstein Aff. as Exh. "D" (the "August 20th Draft"); *see also* Severance Agreement, dated 10/9/87, annexed to

the Rubenstein Aff. as Exh. "F" (the "October 9th Draft").

Specifically, the August 20th and October 9th Drafts are replete with references to the fact that the rights and obligations of the parties are triggered "[u]pon execution of this Agreement." *See* August 20th Draft, at ¶¶ 1, 2(a), 7.1, 7.2, 7.3; October 9th Draft at ¶¶ 1, 2(a), 5, 6.9, 7.1, 7.2, 7.3, 8.3. Neither party ever took exception to these provisions. Moreover, such language "conclusively establish[es]" a mutual intent not to be bound prior to the execution of a written contract. *See Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262 (2d Cir.1984), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984).

In addition, both the August 20th and October 9th Drafts expressly provide that the severance agreement:

> (which includes the Exhibits annexed hereto and all other documents being executed and delivered concurrently with the execution and delivery of this Agreement) *contains the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements, arrangements and understandings, written or oral, relating to the subject matter hereof.*

August 20th Draft at ¶ 8.3 (emphasis added); October 9th Draft at ¶ 8.3 (emphasis added). The August 20th and October 9th Drafts further provide:

> No amendment, modification, cancellation or extension of this Agreement or the other instruments to be executed pursuant hereto may be made ... *except by a written instrument executed by the parties hereto* ...

*id.* at ¶ 8.4 (emphasis added), and that

> All notices required or permitted under this Agreement shall be given *in writing* ....

*Id.* at ¶ 8.5 (emphasis added); *see also* Draft Settlement Proposal, dated 7/10/87, annexed to the Rubenstein Aff. as Exh. "C" (the "July 10th Draft") (indicating that "[t]he definitive agreement shall clearly define the nature of [the] business in order to avoid any future disputes regarding the scope of this restrictive covenant."). Where, as here, the draft agreement declares on its face "that 'when duly executed' it would set forth the parties' rights and obligations, that there were no other agreements between the parties, and that any modification in the agreement would also have to be in writing and signed," the evidence "unequivocally" supports the position that the parties intended a writing. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d at 76; *see also Reprosystem, B.V. v. SCM Corp.*, 727 F.2d at 262.

Moreover, various key dates in the August 20th and October 9th Drafts were to be measured from the "date of this Agreement," thus evidencing the parties' intent that the Agreement not be binding before formal execution. Specifically, Katz and Zucker were to execute and deliver mutual general releases at the closing "upon the execution of this Agreement...." *See* August 20th Draft at ¶¶ 7.1, 7.3; October 9th Draft at ¶¶ 7.1, 7.3. Similarly, Archer was to "deliver to Zucker upon the execution of this Agreement," stock certificates representing transfer of the stock of Archer Boston and Archer Chicago as well as "written instrument[s]" evidencing cancellation of certain debts owed to Archer and Katz by Archer Boston and Archer Chicago. *See* Terms and Conditions Applicable to Transfer of Shares of Boston and Chicago to Zucker, attached to the August 20th Draft as Exhibit "C," at ¶¶ 1.1, 2.1, 2.2. Moreover, the payment schedule was also to be measured from the date of the execution of the Agreement. August 20th Draft at ¶¶ 2.1(c), 2.1(c)(i), 2.1(c)(ii), 2.1(c)(iii); October 9th Draft at ¶¶ 2.1(a), 2.1(b), 2.1(d)(i), 2.1(d)(ii), 2.1(d)(iii). "Such provisions attach great significance to the execution date and may be viewed as 'impediment[s] to forming a binding agreement prior to some formal time of execution.'" *Davidson Pipe Co. Inc. v. Laventhol & Horwath*, Nos. 84 Civ. 5192, 84 Civ. 6334, 1986 WL 2201, at *4 (S.D.N.Y. Feb. 11, 1986) (quoting *Winston v. Mediafare Entertainment Corp.*, 777 F.2d at 81)). Thus, the language of the proposed agreement supports Archer's contention that the parties intended that the agreement would be signed on a specified date, and that, as money would not become payable until that date, the parties placed great importance on the formalities of execution.

Second, in addition to the language of the draft agreements, language used in correspondence and other documents also reflects the parties' intent to be bound only if a writing was executed. For example, the language, and indeed, the very existence of the Can Carriers Escrow Agreement, which was signed by Katz and Zucker and drafted by Zucker's attorney (an escrow agent), makes plain the parties' intent to require a signed writing. For instance, the "Whereas"[2] clause of the Escrow Agreement states that:

WHEREAS, there is a dispute between Archer and Zucker ... regarding which disputes they have arrived at a settlement agreement;

WHEREAS, *prior to memorialization of that agreement,* the Shareholders have an immediate opportunity to dispose of the business being conducted ...

*See* Escrow Agreement, annexed to the Rubenstein Aff. as Exh. "G" (emphasis added). Paragraph 3.2 of the Can Carriers Escrow Agreement provides further that:

3.2 *Demand for Release.* In the event that [Archer and Zucker] *have not executed a written Settlement Agreement* ... on or before October 30, 1987, the Escrow Agent shall, upon receiving a written demand for release from either Archer or Zucker, immediately release fifty (50%) percent of the Escrow Funds ... to each of Archer and Zucker ...

*Id.* at ¶ 3.2 (emphasis added). Paragraph 3.3 of the Can Escrow Agreement also provides in pertinent part:

3.3 *Execution of Settlement Agreement.* Upon receipt by the Escrow Agent of a fully executed copy of a Settlement Agreement ... this escrow shall terminate ...

*Id.* at ¶ 3.3. Thus, the disbursement of the escrow funds hinged upon the execution of a written settlement agreement.

Faced with language comparable to that contained in the Can Carriers Escrow Agreement, the Second Circuit in *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 72 (2d Cir.1989) ("*Arcadian* "), held this lan-

guage determinative of its ruling that the parties intended a writing requirement. The Court described the language that led it to its holding as follows:

the November 6 memorandum provided that if negotiations for the sale failed, Arcadian would repay any capital expenditures agreed to thereafter ... and if the negotiations failed through no fault of API, Arcadian would refund API's deposit. The November 6 memorandum also stated that "the service and supply agreement will be negotiated and agreed to by December 31, 1986 and a binding sales agreement will be completed by December 31, 1986."

*Id.* at 70. The *Arcadian* court found that "[t]he language of the November memorandum—two references to the possibility that negotiations might fail and the reference to a binding sales agreement to be completed at some future date—shows that Arcadian did not intend to be bound." *Id.* at 72.

The escrow arrangement in *Winston v. Mediafare Entertainment Corp.,* 777 F.2d at 81, also played a significant role in the Second Circuit's decision reversing the denial of summary judgment to defendants. Specifically, the *Winston* court found "obvious" confirmation of the parties' intent in the promise to hold certain monies in escrow pending execution and delivery of the settlement agreement. The court stated:

Even more significant is the statement in [plaintiff's attorney's] June 20 letter promising to hold the $15,000 check 'in escrow pending execution by my client and delivery to you of two fully executed copies of the agreement.' By this language [plaintiff's attorney] confirmed the obvious understanding that the settlement contract would not be effective until executed by both sides.

*Id.* at 81. Thus, the "attorney's request that another party execute and return documents, coupled with his promise to hold in escrow until his own client has also signed those documents, strongly suggests an intent that

---

**2.** Although "Whereas" clauses do not determine a contract's operative effect, they do provide "background in relation to which the meaning and intent of the operative provisions can be

determined," and are thus, "illuminating." *Jim Bouton Corp. v. WM. Wrigley Jr. Co.,* 902 F.2d at 1077.

the agreement must be reduced to a written, signed document that would become effective only when fully executed." *Id.*

The language of the Can Carriers Escrow Agreement in this case demonstrates that its purpose was to preserve the *status quo* so that the assets of Can Carriers could be sold to a third party before Zucker and Archer were able to finalize their settlement negotiations by executing a written agreement. Thus, Zucker and Katz agreed in writing that if they failed to "execute a written Settlement Agreement" by October 30, 1987, they would each receive fifty percent of the escrow funds and each retain the right to dispute each other's fifty percent beneficial interest in the Can Carriers proceeds, thereby holding in abeyance their respective claims pending the execution of a written agreement. By this language, the escrow agreement confirmed the parties' understanding that the settlement contract would not be effective until executed by both sides.

Third, in addition to the August 20th and October 9th Drafts and the Can Carriers Escrow Agreement, correspondence also indicates that a written, executed settlement agreement was central to both parties. *See, e.g., Chromalloy Am. Corp. v. Universal Hous. Sys., Inc.,* 495 F.Supp. 544, 550 (S.D.N.Y.1980) (finding no oral contract where "correspondence between the parties not only refers to a written agreement, but expressly disclaims any intention to be bound until execution of such a document"), *aff'd,* 697 F.2d 289 (2d Cir.1982). For example, a letter dated October 6, 1987, from Ackermann to Rubenstein reads in pertinent part as follows:

> In the mutual interest of satisfying the requirement for *the execution of a Settlement Agreement* by or before the October 30, 1987 release date contained in Paragraph 3.2 of the Escrow Agreement, I am available to do any *redrafting required to conform the initial draft of the Settlement Agreement dated August 20, 1987 to our subsequent oral understanding.*

*See* Ackermann Letter, dated Oct. 6, 1987, annexed to the Rubenstein Aff. as Exh. "H"

(emphasis added). Similarly, in a November 3, 1987 letter to Ackermann, Zucker indicated that "Archer Services, Inc. ("Archer") and I have not as of October 30, 1987 entered into a written Settlement Agreement for our interests in Archer and other related entities," and then demanded immediate release of fifty percent of the escrow funds. *See* Zucker Letter of 11/3/87, annexed to the Katz Aff. as Exh. "A." These letters make clear that Zucker and his attorneys considered the draft agreements to be non-binding proposals, and not, legally enforceable agreements.

The sole reference which presents some doubt about the writing requirement is language contained in the Can Carriers Escrow Agreement that "there is a dispute between Archer and Zucker ... regarding which disputes they have arrived at a settlement agreement." *See* Escrow Agreement, annexed to the Rubenstein Aff. as Exh. "G." However, not only did that statement make no explicit reference to a waiver of a writing requirement, in fact, the next "Whereas" clause explicitly states that the parties were placing funds into escrow "prior to memorialization of that agreement." *Id.* Therefore, the Court finds that this one reference to "arriving at an agreement" does not diminish the weight of substantial evidence indicating the parties' intent to be bound only by a writing. *See, e.g., R.G. Group, Inc. v. Horn & Hardart,* 751 F.2d at 76 (finding no contract between the parties despite telephone conversation that parties had reached a "handshake agreement").

### 2. The Oral Testimony

The parties' sworn deposition testimony provides further support for Archer's position that a written settlement agreement was intended. Although Zucker contends that he had a binding, enforceable agreement by virtue of a telephone conversation on October 2, 1987 between Alpert and Rubenstein, in which the August 20th Draft was allegedly "adopted," *see* Complaint at ¶ 101, Zucker conceded at his deposition that he, like Katz[3], understood that a writing was necessary to conclude the deal.

---

3. Katz has provided sworn testimony that "[i]t

was my intention that there could be no binding

Q. Did you believe as you left the Paul, Weiss offices after the July 1987, meeting, that a writing was necessary in order for you to have a contract with the other side?

A. Yes.

Q. You thought a writing was necessary at that point?

A. I thought that it was going to be put in writing, yes.

Q. Why do you think a writing was necessary?

A. Because there was nothing written and signed at the meeting.

Q. And you thought you needed something written and signed after that meeting for there to be a contract?

A. Yes.

*See* Deposition of Irwin A. Zucker, taken on June 11, 1991 (the "Zucker Dep."), at 25–26. Moreover, Zucker also admitted that he broke off negotiations because no writing was executed:

Q. Did there come a time in October of '87 in which you said in words or substance, ... that you wanted a signed agreement by the end of the month, October of '87?

A. Yes....

Q. What were you saying would be the outcome of not having a signed deal by the end of the month?

A. That I was free to exercise whatever other options that I had.

Q. What do you mean by that?

A. To start a suit.

Q. To start a suit?

A. Yes.

Q. In other words, if you didn't have a signed agreement by the end of the month, you would assert your claims against Archer in a courtroom?

A. Yes.

Q. Did you in fact get a signed agreement by the end of the month?

A. No, I did not.

Q. And at the end of the month, you sued.

A. Yes.

Zucker Dep. at 109, 111. If Zucker believed, as he testified, that the August 20th Draft was a binding agreement as of October 2, 1987, there was no logical reason why, on or about October 12, 1987, Zucker threatened that, if a fully signed, written settlement agreement was not finalized by October 30th, he was free to file a lawsuit. Thus, by Zucker's own admissions, the various draft documents were merely a first effort to put in writing the terms of a multi-faceted transaction and settlement, and not a binding, legally enforceable contract. Accordingly, with respect to the first factor, the Court finds that, although neither party expressly reserved the right not to be bound, their draft proposals, correspondence and communications reveal such an intent.

**B. Partial Performance of the Alleged Agreement**

■ The second of the four factors to be considered by the Court is whether one party's partial performance of the alleged contract and the other party's acceptance of that performance shows that both parties understood a contract "to be in effect." *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d at 76. Thus, for example, performance of an agreement for a year was found by this Court to be "strong circumstantial proof that the minds of the parties had met on the essential elements and that they were not waiting for a formal written instrument." *Viacom Int'l Inc. v. Tandem Prods., Inc.*, 368 F.Supp. 1264, 1270 (S.D.N.Y.1974), *aff'd*, 526 F.2d 593 (2d Cir.1975).

In the case at hand, Paragraph 5 of the unsigned August 20th Draft provides that Zucker "acknowledges that he has no interest in the outstanding stock of Can or in the proceeds from the anticipated sale of such corporation," and that Zucker will deliver to Archer signed stock certificates, endorsed in blank, so as to allow Archer to consummate the sale to Cycle Services. *See* August 20th

---

agreement unless and until both parties signed a written contract and executed the mutual releas-

es as well as the other documents." Katz Aff. at ¶ 8.

Draft at ¶ 5. After receiving confirmation that Katz had signed the Escrow Agreement, Zucker signed the stock certificates and consented to the Can Carriers' sale. In his Complaint, Zucker now alleges that this decision to consent to the Can Carriers' sale constitutes partial performance. Complaint at ¶ 104. Similarly, at his deposition, Zucker also suggests that the "partial performance" and resulting "detriment" to him consisted of being forced to participate in the Can Carriers' sale, of which he wanted no part. Zucker Dep. at 72. He further suggests that the money he was to receive from the Can Carrier proceeds, if no settlement was reached, was to serve as some sort of "penalty" imposed on Archer for not producing a signed, written agreement by a date certain. *Id.* The Court finds, however, that Zucker's interpretation is without merit.

First, by consenting to the Can Carriers' sale—an entirely separate transaction from the proposed severance package—Zucker did not "partially perform" the unsigned August 20th Draft settlement agreement. In fact, the draft barely mentions the Can Carriers' sale; it only provides that Zucker is to relinquish his interest in Can Carriers and to deliver to Archer a stock certificate evidencing all Can Carrier shares registered in his name—neither of which he ever did. Moreover, although Paragraph 5 of the August 20th Draft also directs Zucker to relinquish his interests in the outstanding stock of Can Carriers and the proceeds from the anticipated sale, Zucker in fact received fifty percent of the Can Carrier proceeds and retains his right to contest Archer's claim to greater than a fifty percent beneficial interest.

Second, even if Zucker's decision to consent to the Can Carriers' sale could somehow be construed as "partial performance," he would still have the burden of proving that Katz's acceptance of that performance meant that Katz intended to be bound. This, Zucker has not done. Accordingly, Zucker's suggestion that his consent to the Can Carriers' sale somehow constitutes partial performance of the settlement agreement and evidences the existence of a binding contract is not persuasive.

## C. The Existence of Open Terms

A third factor the Court must analyze is whether there was "literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to." *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d at 76 (wherein the existence of one material issue, namely, the territory to be developed under a franchise, was sufficient to support defendants' position that there had to be an executed writing). The evidence supports Archer in that there was at least one material issue which was never resolved.

Specifically, one material issue which the parties never resolved was whether a portion of the settlement consideration to be paid to Zucker would be allocated for tax purposes to alleged personal injuries suffered by Zucker. Archer questioned whether such an allocation could be accomplished without adverse tax consequences to Archer, *i.e.*, the loss of the right to deduct payments to Zucker. This issue, which could have impacted on the after tax cost to Archer of the settlement, was still open as of the commencement of this litigation. *See* Zucker Dep. at 134–35. As Zucker acknowledged at his deposition:

Q. The tax issue on whether $250,000 would be allocated to some kind of pain and suffering or other injury, so that it would not be taxable to you, and yet still be deductible to Archer?

A. Yes. . . .

Q. Was there agreement reached on these issues? . . . .

A. To my knowledge, I don't believe so.

Zucker Dep. at 135–36; *see also* Zucker Aff. at ¶ 5 ("After [October 2, 1987], we admittedly, however, had one lingering disagreement"); Deposition of Ernest Rubenstein, taken on Sept. 12, 1991, annexed to the Affidavit of Lee D. Unterman, sworn to on Feb. 19, 1992, as Exh. "A". at 57 ("there was one issue which I think . . . was never resolved, it was never agreed to, and that was the wish of Zucker's tax advisors to characterize the payment in a way we felt was contrary to the facts but which . . . raised a tax risk to us as to deductibility."). Thus, the Court finds

that Zucker is incorrect in suggesting that there was "literally nothing left to negotiate."

### D. Business Practice

■ Finally, the Court must determine whether the proposed agreement concerns a complex transaction which as a practical business matter would be normally reduced to writing. *Winston v. Mediafare Entertainment Corp.*, 777 F.2d at 83; *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d at 76. Although Zucker characterizes the proposed transaction as "simplistic," *see* Pl. Mem. at 3, in fact, the draft agreement was extremely complex, involving an aggregate $1.1. million, the stock transfer of two of defendant's corporations, non-competition covenants, rights of first refusal, promises to indemnify, regulatory approval, exchanges of mutual releases, disclosures, of liabilities, myriad tax considerations, as well as many other covenants and commitments. *See Winston v. Mediafare Entertainment Group*, 777 F.2d at 83 (where $62,500 was at issue, payment was to be made over several years and the parties engaged in substantial redrafting, the fact that the agreement was only four pages in length did not necessarily mean that the settlement agreement was not the type that requires a written contract); *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d at 71 ("when substantial sums of money are at stake it is neither unreasonable nor unusual for parties to require that their contract be entirely in writing and signed before binding obligations will attach.").

In addition, the complexity of the deal is also reflected in the number of written drafts that were prepared by the parties. *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d at 262. "These drafts ... reflect a practical business need to record all the parties' commitments in definitive documents." *Id.* at 262–63. In this case, the most recent of six proposals was 65 pages long, included eighteen exhibits and described numerous complex transactions and far-reaching arrangements. *See* October 9th Draft. Moreover, the very purpose of the agreement was to avoid litigation. *See* Katz Aff. at ¶ 5; Zucker Aff. at ¶¶ 11–12; Zucker Dep. at 74 ("In my understanding, that was the normal course of events, that an oral agreement would have memorialized in writing."). Thus, the Court finds that the parties simply could not have intended that the various draft documents and oral understandings constituted a legally enforceable contract. Accordingly, this factor also weighs in favor of Archer.

In sum, in light of the fact that (1) the August 20th and October 9th Drafts, the Can Escrow Agreement, the parties' correspondence and deposition testimony evidence an intent to be bound by a written contract; (2) Zucker's consent to the Can Carriers' sale did not constitute partial performance of the proposed severance package; (3) at least one open term was left to be negotiated following the October 2nd phone conversation where the parties allegedly reached final agreement; and (4) the agreement was complex, involved a substantial sum of money and had already been through several drafts, the Court finds that there is no genuine issue of fact that the parties intended to be bound by a signed, written agreement. Therefore, Counts 12 and 13 of the Third Amended Complaint, which allege an enforceable oral agreement as of October 2, 1987, are dismissed.

## II. The Statute of Frauds

■ Even if Zucker could demonstrate the existence of an oral contract, this oral contract would be rendered void by New York's Statute of Frauds, which provides that "[e]very agreement, promise or undertaking is void, unless it or some ... memorandum thereof be in writing, and subscribed by the party to be charged ... if such agreement ... is not to be performed within one year...." N.Y.Gen.Oblig.L. § 5–701(a)(1) (McKinney's 1989).

In its March 1, 1989 decision, the Court granted defendants' motion to dismiss the settlement agreement claims as they were set forth in the Second Amended Complaint, on the grounds that:

> Under New York law ... this alleged agreement is within the statute of frauds.... [which] unequivocally provides that such an agreement ... shall not be denied effect as a defense or as the basis of an action or counterclaim ... provided

the promise of the party against whom it is sought to enforce the accord is in writing and signed by such party or his agent. *Zucker v. Katz*, 708 F.Supp. at 538. The Court found further that "[i]f plaintiff does replead these claims, he should specifically set forth the alleged fraudulent conduct and/or satisfactory writings." *Id.* at 539.

In response to the Court's Order, Zucker relies on what appears to be four documents [4], including: (1) the July 10th Draft prepared by Rubenstein; (2) the August 20th Draft Settlement Agreement (Complaint at ¶ 100); (3) an alleged "acknowledgement of this agreement" which "took place in a writing dated October 2, 1981 sent by Alpert to Rubenstein" (Complaint at ¶ 102); and (4) the Can Carriers Escrow Agreement dated October 6, 1987 (Complaint at ¶ 105). The Can Carriers Escrow Agreement is the only one of these documents signed by either of the defendants. The Court finds, however, that each of these documents, separately and together, fail to meet the requirement of a sufficient "memorandum" under New York Law.

As a threshold matter, Zucker must meet the following requirements:

All of [the terms of the contract] must be set out in the various writings presented to the court, and at least one writing, the one establishing a contractual relationship between the parties, must bear the signature of the party to be charged, while the unsigned document must on its face refer to the same transaction as that set forth in the one that was signed.

*Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 110 N.E.2d 551, 554 (1953); *see also R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d at 77–78. The writings put forth by Zucker, however, contradict the existence of the alleged oral agreement. Although Zucker relies, in part, on the August 20th Draft Agreement, the unsigned draft states that it is effective only when signed, that it repre-

sents the entirety of the agreement between the parties, and that any modification of its terms must be in writing and signed. Similarly, the unexecuted July 10th Draft is clearly labelled "DRAFT," is entitled *"Settlement Proposal"* and expressly refers to a "definitive agreement" to be finalized in the future. Likewise, the Can Carriers Escrow Agreement states explicitly that, "prior to memorialization of [the settlement agreement]," the parties would escrow the proceeds from the Can Carriers' sale. These provisions indicate that the parties intended to reduce their agreement to a writing and, thus, contradict Zucker's claim that the parties agreed to an oral contract. *See R.G. Group, Inc. v. Horn & Hardart*, 751 F.2d at 78 (rejecting an attempt to prove the existence of an oral contract by relying on similar language); *Scheck v. Francis*, 26 N.Y.2d 466, 311 N.Y.S.2d 841, 260 N.E.2d 493 (1970) (where both parties understood that the agreements were to take effect only after they were signed, plaintiff could not satisfy the Statute of Frauds).

The writings also fail to satisfy the Statute of Frauds because they are incomplete. The October 2, 1987 letter from Alpert to Rubenstein, which is unsigned by the party to be charged, is absolutely barren of any reference to a settlement agreement. Similarly, the Can Carriers Escrow Agreement, which is the only writing signed by Katz, does not refer at all to the complete terms (or any terms) of the settlement agreement. Moreover, the August 20th Draft cannot possibly contain all of the "essential terms of the contract" as it was superseded by the October 9th Draft prior to the termination of negotiations and does not include the issue regarding the tax consequences of characterizing Zucker's payment as personal injury compensation—which Zucker concedes was discussed after August 20th. *See* Zucker Dep. at 29–31. Thus, none of these writings sets out the terms of the contract with enough clarity to constitute "complete evidence" of a definite severance agreement.

4. Two of the initial *six* documents raised by Zucker as satisfying the Statute of Frauds, namely, (1) an alleged "memorandum prepared by plaintiff's attorney in October 1987" (Complaint at ¶ 106); and (2) an alleged memorandum prepared by defendants' attorney for which no date is specified in the Complaint (Complaint at ¶ 107), have never been identified. Accordingly, as no documents fitting either of these descriptions has been produced, the Court disregards these two memoranda for purposes of this opinion.

**152**

Therefore, the Court concludes that there is no triable issue regarding Zucker's failure to satisfy the Statute of Frauds.

### III. Failure to Plead Fraud with Particularity

In Count Fourteen of the Third Amended Complaint, Zucker alleges that Katz "never intended to perform the Agreement" and that he was simply "promising Zucker anything that was necessary in order to induce Zucker to perform necessary various services." Complaint at ¶ 115. The Complaint suggests further that Katz was simply pretending that he wanted to settle with Zucker, when in fact, all he really wanted was to obtain Zucker's consent to the Can Carriers' sale. *Id.* at ¶¶ 115–118. Thus, the allegations of fraud consist of references to Katz's unspecified "fraudulent representations" that he would enter into a settlement agreement, and then, after obtaining Zucker's consent to the Can Carriers' sale, "committed the final coup de grace by refusing to live up to the Agreement." *Id.* at ¶¶ 117–118.

Pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, a plaintiff must allege with specificity facts which give rise to a strong inference that the defendants had an intent to defraud, and knew that their representations were false when made. *Connecticut Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir.1987); *Ross v. A.H. Robins Co.*, 607 F.2d 545, 553 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980); *Crystal v. Foy*, 562 F.Supp. 422, 425 (S.D.N.Y.1983). Moreover, New York courts have rejected allegations that attempt to convert breach of contract actions into fraud claims.

> Breach of promise sounds in contract, not fraud. A contract action may not be converted into one for fraud by the mere additional allegation that the contracting party did not intend to meet his contractual obligation.

*Comtomark, Inc. v. Satellite Communications Network, Inc.*, 497 N.Y.S.2d 371 (1st Dep't 1986).

In the case at hand, Zucker offers no facts supporting his general allegations of fraud, despite having three opportunities to do so. Accordingly, Count 14 of the Third Amended Complaint is also dismissed.

### CONCLUSION

For the reasons stated above, Archer's motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, is granted, and Counts 12, 13 and 14 of the Third Amended Complaint are dismissed with prejudice. Zucker's cross-motion for an order, also pursuant to Rule 56 of the Federal Rules of Civil Procedure, granting him partial summary judgment on Counts 12, 13 and 14 of the Third Amended Complaint is denied. The parties are directed to proceed with discovery, and appear before this Court for a pretrial conference on Thursday, January 20, 1994, at 2:00 p.m.

SO ORDERED.