DELLWOOD FOODS, INC., Plaintiff,

v.

KRAFTCO CORPORATION, Defendant.

No. 76 Civ. 3375 (GLG).

United States District Court,
S. D. New York.

Sept. 29, 1976.

Botein, Hays, Sklar & Herzberg, New York City, for plaintiff, by Stanley M. Kolber, Neal R. Silverman, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendant, by William R. Norfolk, New York City, of counsel.

## OPINION

GOETTEL, District Judge.

Plaintiff, Dellwood Foods, Inc. ("Dellwood"), is suing Kraftco Corporation ("Kraftco") for an alleged breach of contract. Initially Dellwood is seeking a preliminary injunction to enjoin Kraftco from any further competition in the metropolitan New York area regarding the processing and distributing of various milk products. Dellwood seeks, in effect, to enforce a covenant not-to-compete which Kraftco had previously agreed to. The motion for the preliminary injunction is denied at this time, for the reasons stated below.

In the fall of 1973, the Sealtest Division of Kraftco decided to close a milk processing plant in Queens and to remove itself from active participation in fluid milk distribution in the metropolitan New York area. Thereafter, it decided to sell this portion of its business to Kraftco.

A formal agreement was entered into on November 11, 1973, between Kraftco and Dellwood (already a major processor and distributor of fluid milk products in the New York area). In the agreement, Kraftco sold to Dellwood its metropolitan area milk business, the milk processing plant in Queens with related property, the "Muller Dairies" trademark, and granted to Dellwood the right and license to use the "Sealtest" and "Light n' Lively" trademarks. The price was $3,271,710: $1,200,000 was paid to Kraftco on November 20, 1973, and the balance is currently being paid in 144 equal monthly payments.

The agreement also contained the following covenant: for a period of five years, commencing November 11, 1973, Kraftco "would not engage in the business of processing or distributing Fluid Milk Products in the Metropolitan Area." (¶ 18).

Two months later, on January 18, 1974, the Federal Trade Commission ("FTC") issued a formal complaint with respect to the Dellwood-Kraftco agreement. The FTC claimed that the effect of the agreement would be to eliminate or prevent actual or potential competition among milk processors and distributors in the metropolitan New York area. The FTC went on to charge that, under the agreement, Dellwood would become the dominant company in the field and that free and open competition would be denied to consumers. (FTC Complaint of 1/18/74).

In response to the FTC Complaint, Dellwood, Kraftco and members of the FTC worked out a solution acceptable to all the parties involved. This resulted in a Consent Order being issued on March 14, 1975, which required the following:

As to Dellwood—

(1) Its Trade License agreement of November 20, 1973, (involving the "Sealtest" and "Light n' Lively" marks) must terminate on March 31, 1976;

(2) It would have to cut back by at least one-half the customers acquired through the Queens plant purchase;

(3) It would have to divest itself of the Queens processing plant; and

(4) It would be subject to a ten year restriction on further acquisitions within the milk industry.

As to Kraftco: Kraftco could make no agreements prior to January 1, 1979, without notifying the FTC involving "Light n' Lively" or "Sealtest" fluid milk products in the metropolitan New York area, which would

(1) License anyone to process and distribute; or

(2) Authorize certain specified other companies to process; or

(3) Authorize any other person or company to distribute; or

(4) Authorize less than five persons or companies (from the specified list) to distribute.

This Consent Order did not void or rescind the agreement; it merely modified it. For example, although Dellwood had to divest itself of the plant, it was not required to divest itself of the other property it acquired. Dellwood could even retain ownership of the plant itself as long as Dellwood did not operate it as a milk processing plant, or could lease it to another company. (If it sells the plant it will, of course, obtain the proceeds of the sale.)

The agreement now remains in effect with the addition of the overriding conditions of the Consent Order. The intent of the Consent Order was simply to prevent the dominance of Dellwood in the milk market as a result of the original agreement between the two major milk companies. As long as open and free competition was not stifled, it would appear that the balance of the agreement was to remain in effect.

With the benefit of hindsight, it is apparent that the covenant by Kraftco not to compete against Dellwood until late 1978 would be directly affected by the Consent Order. But the Consent Order contained no mention or provisions with respect to the covenant not to compete. In fact, the parties involved in the Consent Order seemed to studiously ignore the effect of the Consent Order on the covenant. As a result the following questions are raised:

(1) What effect, if any, does the intervention of the FTC have on the covenant not to compete?

(2) If the covenant is still viable, has Kraftco violated it?

(3) Is Dellwood presently paying, in whole or in part, for the covenant?

(4) If Dellwood prevails, what is the remedy?

It is in the context of these complex factual and legal considerations that Dellwood's motion for a preliminary injunction must be viewed.

■ The standards to be applied to motions for preliminary injunctions are matters of black letter law. They are, in the relative order of their importance:

(1) The significance of the threat of irreparable harm to the plaintiff if the injunction is not granted;

(2) The state of the balance between this harm and the injury that granting the injunction would inflict on the defendant;

(3) The probability that plaintiff will succeed on the merits; and

(4) The public interest.

Wright & Miller, *Federal Practice and Procedure: Civil* § 2948 at 430–31 (1973). Of course if plaintiff can show a substantial likelihood of success, the extent of irreparable injury that must be shown is not great. Conversely, if the balance of hardship tips decidedly in its favor, the probability of success may be lessened. *Halder v. Avis Rent-A-Car System, Inc.,* 541 F.2d 130 (2d Cir. 1976); *Sonesta Int'l Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir. 1973).

With respect to the first standard, Dellwood claims that Kraftco's reentry into the milk market is causing a loss of customers which, they allege, is likely to be permanent. Dellwood supplied the court with exhibits and depositions attempting to demonstrate the actual loss of customers. (From this it would appear that Dellwood has lost only a small amount of its applicable business to date).

■ Kraftco counters this argument by attacking the nexus between Kraftco's reentry and Dellwood's customer loss. Kraftco claims the loss of customers was due in part to reasons other than Kraftco's competition. In any event, even assuming that Kraftco's actions were the sole cause of Dellwood's loss of customers, Dellwood has not shown this court any substantial evidence to support its claim of irreparable injury. *Robert W. Stark, Jr., Inc. v. New York Stock Exchange, Inc.,* 466 F.2d 743, 744 (2d Cir. 1972). Furthermore, the dam-

ages suffered by Dellwood, if any, would be capable of adequate money damages after a final resolution. (There is also, as will be indicated later, the possibility that the remedy to be accorded Dellwood is a reduction of the amount still owing to reflect the loss of the value of the covenant not to compete). Accordingly, since an effective remedy is ultimately available, there appears to be no present need for preliminary relief. Wright & Miller, *supra,* at 434; *Unicon Management Corp. v. Koppers Co.,* 366 F.2d 199 (2d Cir. 1966).

As to the second standard, Kraftco claims that the granting of a preliminary injunction would cause irreparable injury to it. Were it enjoined from having its product on the market, Kraftco claims that the reputation and sales potential of its product would be greatly and irreparably damaged. A preliminary injunction would indeed be burdensome on Kraftco. The degree of the burden is not easily ascertainable but its mere existence is significant and weighs, to some degree, against imposing any judicial restraints prior to an adjudication on the merits. At present, the balance of hardships is nearly equal.

■ The third standard deals with plaintiff's probability of succeeding on the merits. The burden is on Dellwood (the party seeking the preliminary injunction) to convince the court "with reasonable certainty" that it would succeed at trial, especially in a situation where, as here, there is an inadequate showing of irreparable injury. *Unicon Management Corp. v. Koppers Co., supra,* at 204. This is a "heavy burden". *Halder v. Avis Rent-A-Car System, Inc., supra.*

■ Dellwood's complaint is rooted in the viability of the covenant not to compete. In the first instance, a strong argument can be made that, in light of the Consent Order and the FTC Complaint, the survival of the covenant would be antithetical to the results intended by the Consent Order. Therefore, it can be argued, the covenant is void and can no longer be relied upon.[1] The

1. If this is the ultimate conclusion on this issue, Kraftco may be liable to Dellwood for the value of the covenant, thereby reducing the amount owed on the amortized payments. But this issue is not before the court at this time.

situation is unique and neither party has cited any controlling precedents.

■ In the second place, even if the covenant were viable, it restricts Kraftco only from processing and/or distributing. Kraftco points out it is doing neither and claims it is in the role of a middleman between other processors and other distributors. This may be a technicality but it must be kept in mind that covenants not to compete are strictly construed, so that the argument cannot be dismissed out of hand.

In total, Dellwood has failed sufficiently to demonstrate a likelihood of ultimate success on the merits. *Robert W. Stark, Jr., Inc. v. New York Stock Exchange, Inc.,* *supra,* at 744; *Unicon Management Corp. v. Koppers Co., supra.*

■ The fourth and final standard concerns the public interest. The FTC is supposed to be representing the public interest when it prevents anticompetitive practices and agreements. If a preliminary injunction were issued here, it would reduce the level of competition in the fluid milk market and partially undermine the purposes of the Consent Order. Since competition is generally held to benefit the public, any reduction in competition must be considered against the public interest.

■ In conclusion, in reviewing all four of the applicable standards for preliminary injunctions, not one weighs solidly in favor of Dellwood (the moving party). Therefore, Dellwood's motion for a preliminary injunction is denied.

It should be noted, however, that Kraftco appears to be increasing its sales efforts. This fact does not presently alter the decision of this court, but it does increase the potential for losses to the plaintiff. And the longer this case awaits an ultimate disposition, the greater the potential losses to the plaintiff (if it should prevail) and the greater the complexity of ascertaining such losses.

The interests of justice dictate a speedy resolution to this dispute. Accordingly, the parties to this dispute are to be prepared for a trial within two months of the date of this decision and expedited discovery is hereby directed.

■ In addition, the denial of the preliminary injunction is without prejudice to the renewal of the motion upon the showing of any substantial change in the factual situation that would substantially and directly bear upon any of the applicable standards. If the extent of competition increases markedly it may be appropriate to invoke injunctive relief as a means of preserving the status quo. *See, e. g., Exxon Corp. v. City of New York,* 480 F.2d 460, 464 (2d Cir. 1973).

SO ORDERED.