Cipriani Fifth Ave., LLC v RCPI Landmark Props., LLC (2004 NY Slip Op 24241)

Cipriani Fifth Ave., LLC v RCPI Landmark Props., LLC

2004 NY Slip Op 24241 [4 Misc 3d 850]

May 3, 2004

Supreme Court, New York County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, October 20, 2004

[*1]
Cipriani Fifth Avenue, LLC, Plaintiff,
v
RCPI Landmark Properties, LLC, et al., Defendants.
Supreme Court, New York County, May 3, 2004

APPEARANCES OF COUNSEL

Wagner, Davis & Gold, P.C., New York City (Steven R. Wagner and Bonnie Reid Berkow of counsel), for plaintiff. Greenberg Traurig, LLP, New York City (Daniel J. Ansell of counsel), and Schulte Roth & Zabel, LLP, New York City (Robert M. Abrahams of counsel), for defendants.

{**4 Misc 3d at 851} OPINION OF THE COURT

Debra A. James, J. 
The Rainbow Room, which consists of facilities that include, among other things, first-class restaurants, bars and catering rooms, is located within the condominiums on the uppermost floors of 30 Rockefeller Plaza (the building), the tallest building in the Rockefeller Center complex. The Rainbow Room with its location at the top of the building is part of the Rockefeller Center complex, a New York City landmark whose construction under the auspices of oil tycoon John D. Rockefeller, Sr., was undertaken and completed in 1934 in the midst of the Great Depression.
For the last six years, under a 20-year lease dated May 15, 1998 with RCPI Trust (the lease), plaintiff Cipriani Fifth Avenue, LLC, a company owned by the Cipriani family of Venice, has operated the Rainbow Room. Defendant RCPI Landmark Properties, LLC[FN1]

is the owner of the condominium units in which the Rainbow Room is located.[FN2]

RCPI Trust's duties under the lease include without limitation all necessary repairs (both structural and nonstructural) to the building systems, the public portions of the building [*2]and the structural elements of the building, both exterior and interior "in conformance with standards applicable to first-class office buildings of comparable age and quality in midtown Manhattan." (Lease § 7.1.)
Cipriani commenced this action against defendant for breach of lease, seeking declaratory and injunctive relief. It moves to preliminarily enjoin defendant from carrying out alleged violations of its obligations under the lease, to wit, from implementing plans to install or use metal detectors as part of a security procedure applicable solely and exclusively to Cipriani's employees and guests; subjecting its guests to unreasonable delays in accessing elevators and/or searching their person and property; closing the 50th Street entrance to the building; and applying either additional security measures or the rules and regulations applicable {**4 Misc 3d at 852}to all the building's tenants in a manner that discriminates against guests and employees of the Rainbow Room.[FN3]

It is Cipriani's application for preliminary injunctive relief with respect to the security measures that the court determines here.
"Preliminary injunctive relief is a drastic remedy and will only be granted if the movant establishes a clear right to it under the law and the undisputed facts found in the moving papers." (Koultukis v Phillips, 285 AD2d 433, 435 [1st Dept 2001] [citation omitted].) To prevail on its motion for a preliminary injunction, Cipriani must demonstrate (1) the probability of success in the underlying action; (2) danger of irreparable injury in the absence of a preliminary injunction; and (3) a balancing of the equities in its favor. (Coinmach Corp. v Fordham Hill Owners Corp., 3 AD3d 312 [1st Dept 2004].)
Federal authority is helpful in applying these standards. As to relative order of importance of the three prerequisites, the District Court in Dellwood Foods, Inc. v Kraftco Corp. (420 F Supp 424, 427 [SD NY 1976]) stated "[t]he significance of the threat of irreparable harm to the plaintiff if the injunction is not granted" is paramount followed by "[t]he state of the balance between this harm and the injury that granting the injunction would inflict upon the defendant" with "[t]he probability that plaintiff will succeed on the merits" being the final inquiry. In United States v Culbro Corp. (436 F Supp 746, 749 [SD NY 1977]), that federal court declared that the standard required "the movant must make a clear showing of either (1) possible irreparable harm and probable success on the merits; or (2) sufficiently serious questions which present a fair ground for litigation and the balance of hardships tipping decidedly in its favor." The Culbro court additionally explained that "the law is clear that [*3]irreparable harm is required under both prongs of that {**4 Misc 3d at 853}test; it is subsumed under the balance of hardship portion of the second prong." (Id. at 749.) Furthermore, defendant is correct that the moving party must show that the irreparable injury is imminent and not remote or speculative. (Golden v Steam Heat, 216 AD2d 440 [2d Dept 1995].)
Cipriani contends that the destruction of its business and damage to its reputation that would result from the implementation of the proposed security measures would not be compensable by money damages. Cipriani founds its contention that it will suffer irreparable harm if interim extraordinary relief is not granted upon its verified complaint and the affidavit of its general manager. In its complaint, Cipriani alleges that after commencement of the lease, it invested substantial sums of money in the Rainbow Room to comply with the lease provisions governing "Initial Installation" and "Operation and Maintenance Covenants" that required that the "business . . . conducted at, through and from the Premises be reputable in every respect" and "be dignified and in conformity with the highest standards of practice of restaurants conducting a similar business in Rockefeller Center or the Fifth Avenue area adjacent thereto."[FN4]

Specifically, the general manager states that Cipriani pays nearly $5 million in annual rent and has invested more than $6 million in improvements to the Rainbow Room in order to maintain its tradition as a world renowned and first class venue. For the first time at a September 2003 meeting with plaintiff's principals, defendant advised in addition to "intrusive and time consuming searches of handbags and other personal property currently being conducted exclusively for employees and guests of the Rainbow," it planned to install walk-through metal detectors at the entrance of the elevator bank servicing the Rainbow Room, through which only guests and employees of the Rainbow Room and no other tenants would be required to walk. The manager asserts he has already received complaints from party planners, {**4 Misc 3d at 854}hosts of parties and their guests about searches of persons and their belongings. He explains that approximately 83% of the Rainbow Room's business comes from large parties and events, resulting in the arrival of hundreds of guests during early evening hours. Many of the women wear jewelry and the men are attired in tuxedos with metal buttons and cuff links. Some guests carry briefcases and most carry cell phones. The manager asserts that metal detectors set to alarm in the presence of a metal firearm, would be triggered in the presence of formal wear, requiring people to empty their pockets or be otherwise searched. Long lines and extensive delays would develop, and guests would have to wait for an hour or more just to enter the elevators. Several party planners, who account for the majority of large events booked at the Rainbow Room, have advised him that if metal detectors are installed, they would no longer be able to recommend the Rainbow Room as a site for large events. In an affidavit submitted on [*4]this motion, one such corporate event planner describes the installation of metal detectors as a "disaster" for the Rainbow Room, whose facilities she would no longer be able to recommend to her clients. Her experience with metal detectors while attending events at the United Nations was a "nightmare," due to the huge traffic jams created when large numbers of people arrive at the same time. In her view the presence of metal detectors is antithetical to the ambiance of an upscale, black tie or dressy corporate or social event. Citing her more than 10 years of experience in the party planning business, she opined that her clients would not choose the Rainbow Room for their events if they had to pass through metal detectors, which would severely damage the business and reputation of the Rainbow Room.
Defendant counters that Cipriani's contention that its reputation and business will be damaged is entirely speculative. It suggests that in the current environment, patrons welcome security checks to ensure their safety. Defendant also contends that any losses from the installation can be quantified and are compensable in money damages.
In an action that involved another landlord-tenant dispute over alterations, the Appellate Division, First Department, upheld a trial court's determination that the tenant would suffer irreparable harm by the landlord's placement of "panic bars [on] certain doors which prevented [the tenant] from passing between its leased and subleased premises." (401 Hotel v MTI/The Image Group, 271 AD2d 228, 230 [1st Dept 2000].) The harm {**4 Misc 3d at 855}that Cipriani has demonstrated based upon the representation of a major party planner is no more compensable than the harm to 401 Hotel resulting from the installation of panic bars. Such an impediment to Cipriani's use of the Rainbow Room, featuring large formal gatherings, represents a diminution in value that would be impossible to measure. Defendant suggests no mechanism for calculating damages, and this court finds that calculation would be not merely difficult, but inestimable. This court notes that while under the lease Cipriani pays a percentage rent that is based on its annual gross sales (see lease § 2.5), an economist would be left to speculate about the proportion of any diminution in gross sales attributable to the number of guests turned away or turned off in the advent of magnetometers. Nor would the granting of an injunction have the effect of awarding Cipriani the ultimate relief it seeks. (Cf. SportsChannel Am. Assoc. v National Hockey League, 186 AD2d 417 [1st Dept 1992].)
An assessment of the state of the balance between this harm and the injury that granting the injunction would inflict upon the defendant shows a rather level scale. Cipriani points out that there has been no incident of violence in the Rainbow Room or anywhere else in the building that would justify the sudden need for metal detectors. It disagrees that metal detectors are necessary to combat terrorism, and points out the remoteness of a person hiding a metal weapon inside formal evening wear. It requests that defendant share its security plans so that both parties may jointly consult an expert to review the options and develop a more suitable plan.
On this question of equities, Cipriani alleges incidentally that defendant contravened the lease not only as to its security plans, but also with respect to its failures to repair the roof above plaintiff's facilities, resulting in water falling into plaintiff's premises during inclement weather. It posits that defendant's recalcitrance on the repairs as well as plans for security are only ploys to gain leverage in defendant's negotiations with Cipriani on defendant's plans to use a portion of the Rainbow Room to create public access to an observatory on the roof of the building as a [*5]tourist attraction and source of additional revenue.
Not surprisingly, the defendant urges that it would suffer inestimable harm were the court to place a restraint on its plans for security. While resulting in only minor inconveniences to Rainbow Room customers, the security measures would confer the benefits of additional safeguards on all occupants and visitors{**4 Misc 3d at 856} to the building and reflect heightened security concerns that are completely reasonable in "this post-9/11 world." Any losses that Cipriani might suffer by threats to its business and reputation, which defendant insists are unfounded, are "dwarfed by the potential damages that could be suffered by the Landlord and the public at large" should necessary and desirable security measures not be implemented and enforced "at the very heart of Rockefeller Center."
Defendant also cites the increased threat of litigation. It cites an article in which the authors advise building owners "to provide appropriate security protection against terrorism and other acts of violence that threaten the safety of New York's building stock and tenants." (LePatner and Korn, Outside Counsel, Building Security Measures and Owner Liability After Sept. 11, NYLJ, May 1, 2003, at 4, col 4.) The article cautions that inadequate security measures would invite criminal premises liability lawsuits, citing the recent Supreme Court decision Gross v Empire State Bldg. (NYLJ, Feb. 27, 2003, at 21, col 2 [Sup Ct, NY County, Lehner, J.]). That case arose out of the tragic incident on February 23, 1997 at the Empire State Building where a deranged man armed with a semiautomatic pistol went to the 86th floor observation deck and without warning, indiscriminately shot one tourist to death and seriously injured six others before committing suicide with the same weapon. The trial court denied the owner's summary judgment motion to dismiss, finding that though there was only a minimal showing of criminal activity within the building prior to the incident, evidence of violence in adjoining stores and sidewalks and bomb threats to the building made the question of the adequacy of security provisions in effect, which did not include metal detectors, one of fact for the jury.
In evaluating the parties' positions, it is significant that the Appellate Division, First Department, recently reversed that lower court decision and ordered the action summarily dismissed. The appellate court held in Gross v Empire State Bldg. Assoc. (4 AD3d 45, 47 [1st Dept 2004]), that in 1997, Empire State Building owners could not have reasonably foreseen the events in question, and therefore owed no duty to visitors to employ x-ray machines, metal detectors and scanners. While acknowledging the proliferation of metal detectors and other security measures that the public now encounters in the aftermath of the attacks on September 11, 2001, the appellate court reiterated the principle that owners are not insurers of the safety {**4 Misc 3d at 857}of those who use their premises. It described a building owner's common-law duty "to take only 'minimal precautions' to protect tenants and visitors from foreseeable harm, including foreseeable criminal acts (Mason v U.E.S.S. Leasing Corp., 96 NY2d 875, 878 [2001])" as "firmly established." (Id. at 46.) Another case in this Department where metal detectors proved no safe harbor or prophylactic against either violent acts or lawsuits is Djurkovic v Three Goodfellows, Inc. (1 AD3d 210 [1st Dept 2003]). Djurkovic involved a nightclub with a reputation and clientele quite different from that of the Rainbow Room (see City of New York v Three Good Fellows Inc., 5 AD3d 209 [1st Dept 2004]). In Djurkovic, metal detectors operated by state licensed security guards who [*6]conducted pat downs at the entrance of the club did not prevent a box cutter-wielding assailant from injuring another patron. The Court observed that (at 210-211) "[a]dmittedly, the detectors were not set at a level sensitive enough to detect small objects, such as keys and, so it would appear, box cutters." Nevertheless, the Court held, as a matter of law, that even though the anticipated presence of large crowds of young people consuming alcohol at a "hip hop" club in early morning hours made the particular criminal act foreseeable, plaintiff failed to establish any breach in the owner's duty to take reasonable security measures to minimize the danger of such a criminal attack.
As for plaintiff's theory that defendant's security proposal is a mere pretext to advance its plan to open an observatory, the court does find the timing of such a proposal, given the challenge to security such public access would generate, to be at odds with defendant's concerns about security expressed in the action at bar. The court is incredulous that the defendant would undermine its "jewel in the crown" tenant in a quest for greater profits, without resolving security challenges it says public access poses even without the additional traffic an observatory would produce. Certainly, all concerned would be loathe to see any repeat of the horrible event in 1997 that occurred in the observatory of another landmark, the Empire State Building.
The court views the facts of Djurkovic as weighing on the plaintiff's side of the equity scale. Its facts support plaintiff's view that imposition of metal detectors and frisking upon guests, who throughout the Rainbow Room's stellar history, are known for exhibiting only maturity, elegance and grace, is not only inappropriate, and ill advised, but also rather ineffective security. Nonetheless, the terrible burden of post-911 history counters {**4 Misc 3d at 858}that weight and justifies owners, in the exercise of their discretion and judgment, undertaking extraordinary precautions. The sad reality is that metal detectors and bag checks have become a "pervasive aspect of everyday life." (Gross, supra at 46.)
Turning to the third prong, evidence demonstrating a likelihood of success need not be conclusive and a prima facie showing of a right to relief is sufficient as actual proof should be left for further court proceedings. (Terrell v Terrell, 279 AD2d 301, 303 [1st Dept 2001].)
Cipriani argues that it will ultimately prevail on its breach of lease claim. It cites article 28 of the lease, which provides, in pertinent part:
"Landlord reserves the right, from time to time, to adopt additional Rules and Regulations and to amend the Rules and Regulations then in effect. Nothing contained in this Lease shall impose upon Landlord any obligation to enforce the Rules and Regulations or terms, covenants or conditions in any other lease against any other Building tenant, and Landlord shall not be liable to Tenant for violation of the Rules and Regulations by any other tenant, its employees, agents, visitors or licensees, except that Landlord shall not enforce any Rule or Regulation against Tenant in a discriminatory fashion." (Emphasis added.)
Cipriani contends that installation of metal detectors solely for the Rainbow Room constitutes discrimination against Cipriani, particularly since at least one building tenant and its guests have not complied with the identification and registration measures already in place for office workers and their guests, who routinely bypass electronic turnstiles with which the elevators that service the Rainbow Room are already equipped.
Defendant argues that [*7]Cipriani has not made any of the showings required to merit an award of preliminary injunctive relief. Defendant urges that plaintiff will not prevail on the merits as lease § 7.3 expressly permits the landlord to alter the building's security systems in its discretion. It reads, in pertinent part:
"Interruption Due to Repairs. Landlord reserves the right to make all changes, alterations, additions, improvements, repairs or replacements to the Building and the Center, including the Building Systems which provide services to Tenant, as Landlord deems necessary {**4 Misc 3d at 859}or desirable, provided that in no event shall the level of any of the Building service decrease in any material respect the level required of Landlord in this Lease as a result thereof, nor shall there be a denial of Tenant's access to the Premises." (Lease § 7.3.)
Under the lease, "Building Systems" is defined as "The mechanical, electrical, plumbing, sanitary, sprinkler, heating, ventilation and air conditioning, security, life-safety, elevator and other service systems or facilities of the Building up to (but to including) the point of localized distribution to the Premises (excluding any systems or facilities exclusively serving the Premises)."
Defendant also argues that lease § 7.1 with respect to the landlord's rights and responsibilities as to operation, maintenance and "necessary repairs" includes the public portions of the building of which the elevator banks and turnstiles are a part.
Though defendant is correct that plaintiff cites no specific provision of the rules and regulations that relate to security, the rules and regulations that are appended to and incorporated by reference in the lease of each of the building's tenants consist of 19 paragraphs, which pertain to various and sundry matters, such as mail delivery, vermin extermination, and pertinent to the action at bar, access to the building. Paragraph 2 of the rules and regulations pertains here, which provides:
"Landlord may refuse admission to the Business outside of Business Hours to any person not having a pass issued by Landlord or not properly identified, and may require all persons admitted to or leaving the Building outside of Business Hours to register (other than customers of Tenant during its business hours). Any person whose presence in the Building at any time shall, in the judgment of Landlord, be prejudicial to the safety, character, reputation and interest of the Building or of its tenants may be denied access to the Building or may be ejected therefrom. In case of invasion, riot, public excitement or other commotion, Landlord may prohibit all access to the Building during the continuance of the same, by closing doors or otherwise, for the safety of the tenants or protection of property in the Building. Landlord shall, in no way, be liable to Tenant for damages or loss arising from the admission,{**4 Misc 3d at 860} exclusion or ejection of any person to or from the Premises or the Building under the provisions of this rule. Landlord may require any person leaving the Building with any package or other object to exhibit a pass from Tenant from whose Premises the package or object is being removed, but the establishment or enforcement of such requirement shall not impose any responsibility on the Landlord for the protection of Tenant against the removal of property from the Premises of Tenant."
[*8]
Countering plaintiff's reliance on the rules and regulations, defendant argues that under section 28 of the lease, to the extent any rule and regulation conflicts or is inconsistent with the lease, the lease controls. It contends that irrespective of any rule or regulation, the lease reserves the right to RCPI to install metal detectors at the entrances to the elevator banks.
Nor does defendant agree that its measures discriminate against Cipriani and its guests. It argues that in fact, the security measures in place for Cipriani are less onerous than those for other tenants. The guests of other building tenants are required to register with the security office, present government issued identification and obtain a temporary access pass permitting that guest to pass through security turnstiles, while Cipriani's guests need only inform the security guard at the elevator bank servicing the Rainbow Room that they are customers of the Rainbow Room to move directly via express elevator to the venue.
Plaintiff has failed to offer prima facie evidence that defendant has breached its rights under the lease sufficient to establish a likelihood of success on the merits of its claims. "It is by no means clear from the contract terms that defendant has in fact violated the parties' agreement, and where contractual language 'leaves the rights of the parties open to doubt and uncertainty,' injunctive relief is inappropriate." (Credit Index v RiskWise Intl., 282 AD2d 246, 247 [1st Dept 2001].)
Under the lease, defendant explicitly reserved the right to make changes, alterations, and/or additions to the security system in the public portion of the premises, where the elevator banks servicing the Rainbow Room are located. Metal detectors would certainly fall within the "security" systems that defendant has the right to alter. Whether the installation of metal detectors would constitute a "denial of Tenant's access to the Premises" under the lease is an issue for determination in this action {**4 Misc 3d at 861}and is subject to interpretation of the contractual language.
Nor has Cipriani made a prima facie showing that defendant has or intends to apply the rules and regulations with respect to access in a fashion that discriminates against Cipriani. All parties agree that given the occupancy capacity of the Rainbow Room, a registration or "reservation" requirement for Rainbow Room guests is impracticable, so that in fact, defendant has continued to apply the rules and regulations, as written, to accommodate Cipriani's enterprise.
Plaintiff's failure to surmount its threshold burden of demonstrating a likelihood of success on the merits of its claims is dispositive on this motion, and the court must therefore deny its motion for injunctive relief pendente lite.
Accordingly, it is ordered that the plaintiff's application for a preliminary injunction is hereby denied.

Footnotes

Footnote 1: Landmark is the successor in interest to RCPI Holdco, LLC. RCPI Holdco, LLC, is the successor by statutory conversion to RCPI Trust.

Footnote 2: Defendant Rockefeller Center Tower Condominium through its board of managers is responsible for the operation and management of those premises. Both defendants are referred to hereinafter collectively as "the defendant."

Footnote 3: On September 16, 2003, this court signed a temporary order restraining defendant from (1) installing or using metal detectors as part of security procedures applicable to only the plaintiff's employees and guests; (2) requiring employees and guests of plaintiff to submit to any security procedures applicable to only the plaintiff's employees and guests, unnecessarily delaying or impeding employees and guests of the plaintiff from access to the Rainbow Room through the 49th and 50th Street entrances to 30 Rockefeller Plaza and through the elevator bank servicing the Rainbow Room. On September 19, 2003, upon application of defendant, this court vacated its September 16, 2003 ex parte order, and with respect to the provision concerning metal detectors, conditioned such vacatur on defendant's providing plaintiff's attorney with 10 days' prior written notice of the installation of any metal detectors. No such written notice has been provided to the court as of this date.

Footnote 4: Cipriani's Internet Web site describes the Rainbow Room, with its unparalleled, sweeping and panoramic views of Manhattan as a "world renowned and luxurious supper club," "epitomizing style, glamor and sophistication" including patronage by international travelers, nobility, politicians and celebrities, who dined, then danced to famous orchestras, such as Duke Ellington and Sy Oliver. In an article of August 22, 1934, entitled "Nightclub to Open Atop RCA Building," the New York Times described the Rainbow Room's circular ballroom with its Art Deco richness and subdued color scheme, whose walls and floors would act as a backdrop upon which "People will furnish the brilliant color."